**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **ROYAL BOROUGH OF** | * |
| **KENSINGTON AND CHELSEA** | |
| **The Town Hall (G29)** | * |
| **Hornton Street** | |
| **London** | * |
| **W8 7NX** | |
| **England** | * |
| **United Kingdom** | |
| | * |
|     **Petitioner,** | |
| | * |
| **v.** | |
| | * |
| **TARA BANFA-LOUIS** | |
| **(a/k/a, Talia Becker, Talia Louis,** | * |
| **Tara Becker, Tara Maynard, Taliya Becker,** | |
| **and/or Taliya Louis)** | * |
| **20 East 74th Street** | |
| **Apt. 6E** | * |
| **New York, NY 10021** | |
| | * |
| **And** | |
| | * |
| **90 Prince Street** | |
| **New York, NY 10012** | * |
| | |
|     **Respondent.** | * |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

<u>**VERIFIED PETITION FOR RETURN OF CHILDREN TO ENGLAND**</u>

**The Convention on the Civil Aspects of International Child Abduction, done at the Hague on October 25, 1980; International Child Abduction Remedies Act, 22 U.S.C. 9001 *et seq*.**

## I.       INTRODUCTION

      1.     This Verified Petition is filed as a result of the wrongful removal of two children,

CB-L, born in 2009, and LCJB born in 2021 (collectively, the "children"), from their habitual

residence of England to New York City.

2.      The wrongful removal of LCJB took place on or about March 19, 2022. The wrongful removal of CB-L took place on or about May 2022.

3.      This Verified Petition is brought pursuant to The Convention on the Civil Aspects of International Child Abduction, done at the Hague on October 25, 1980[1] (hereinafter the "Hague Convention" or "Convention"), and the International Child Abduction Remedies Act[2] (hereinafter "ICARA").

4.      The Convention came into effect in the United States of America on July 1, 1988, and was ratified between the United States of America and the United Kingdom (which includes England) on July 1, 1988.[3]

5.      The objectives of the Convention are to secure the immediate return of children wrongfully removed or wrongfully retained in any Contracting State, and to ensure that 'rights to custody' under the law of one Contracting State are effectively respected in other Contracting States.

## II.      JURISDICTION

6.      This Court has jurisdiction under ICARA § 9003 because this case involves the removal of two children under the age of 16 to the United States from their habitual residence of England. The children are currently located within the jurisdiction of this Court in the Southern District of New York.

---

[1] T.I.A.S. No. 11,670 at 1, 22514 U.N.T.S. at 98, *reprinted in* 51 Fed. Reg. 10494-10516 (1986).
[2] 22 U.S.C. 9001 *et seq*.
[3] Hague Abduction Convention Country List, text available at: https://travel.state.gov/content/travel/en/International-Parental-Child-Abduction/abductions/hague-abduction-country-list.html (last visited September 28, 2022).

### III.    STATUS OF PETITIONER AND CHILDREN

7.      The children are both Wards of the English High Court. The English High Court has been and remains seised with proceedings concerning the older child CB-L since April 2022—prior to his removal. The English Family Court and thereafter the English High Court have been seised with proceedings concerning the younger child LCJB since December 2021—prior to his removal. Thereafter, Wardship and a Return Order were made for LCJB on April 4, 2022. In addition to being Wards of the English High Court, the children are now and have been subjects to a Child Protection Plan with the English local government's Social Work Team since January 6, 2022.  Both children have been removed from England in violation of orders of the English High Court prohibiting their removal.

8.      The Petitioner is the Royal Borough of Kensington and Chelsea ("RBKC"). The RBKC is a local government body in England (known as the "local authority" in England), with a Social Work Team that is directly involved with the children and is seised with their care. The Social Work Team at the Westminster County Council ("WCC") had previously been the local authority in England directly involved with the family from 2010-2022. The RBKC took over for the WCC in or about early March 2022 after the family moved from the WCC's district into the RBKC's district.

9.      The Respondent, Tara Banfa-Louis (a/k/a Talia Becker, Talia Louis, Tara Becker, Tara Maynard, Taliya Becker, and/or Taliya Louis) (the "Mother") is the children's mother.

10.      Upon information and belief, Alexey Belorousov is the biological father of the older child CB-L. He is not named on CB-L's birth certificate. Upon information and belief, Mr. Belorousov lives in Russia. He is not a party to this case. He is not a party to any proceedings in England relating to CB-L.

11.     Timothy Becker is listed as the father of the younger child LCJB on LCJB's birth certificate. He is not LCJB's biological father. Mr. Becker had been a party to proceedings in England relating to LCJB until Samuel Ajala was established as LCJB's father through DNA testing. A declaration of parentage was made in respect of Mr. Ajala on August 18, 2022. Mr. Becker is no longer a party to any proceedings in England relating to LCJB.

12.     Samuel Ajala is LCJB's biological father. He is not a party to this case. He is a party to all cases involving LCJB in England.

13.     Christina Louis is the children's maternal grandmother (the "Maternal Grandmother"). Ms. Louis lives in New York.  After the younger child LCJB was removed from England to New York, the Maternal Grandmother initiated child custody proceedings relating to the younger child LCJB in the Family Court of the State of New York, despite the English Court already having been seised with proceedings with respect to both children. Upon information and belief, the Maternal Grandmother has not initiated child custody proceedings relating to the older child CB-L.

14.     Upon information and belief, the Mother and both children are currently staying with the Maternal Grandmother at her home located at 20 East 74th Street, Apt. 6E, New York, New York, 10021 and/or at 900 Prince Street, New York, NY 10012.

## IV.     FACTS

15.     The Mother is a dual citizen of Hungary and the United States. She attended Georgetown University for her undergraduate education, and thereafter attended the University of Oxford in England for her graduate education.

16.     The Mother continued to live in England after the conclusion of her graduate program.

17.     The older child CB-L was born in England in September 2009.

18.     Upon information and belief, CB-L has lived with the Mother in England since his birth. The RBKC's records relating to CB-L confirm that he has lived with the Mother in England since at least 2010.

19.     CB-L's father has never been involved in his life. Upon information and belief, CB-L's father is Russian, and returned to Russia around the time of CB-L's birth.

20.     The Mother and older child first became known to the local authority in England when CB-L was only 11 months old. WCC was the local authority for the district associated with the Mother's address at the time. The Mother and CB-L lived in the affluent Belgravia neighborhood in London, which is in WCC's district.

21.     In October 2010, the Mother called the local police to report that CB-L's father had threatened to abduct CB-L to Russia. The Mother also reported that she had experienced domestic violence throughout her relationship with CB-L's father.

22.     Later that same month, the Mother called the local police again and reported that she was being harassed by another former romantic partner. The Mother also reported that the former partner had a cocaine addiction and that he had been emotionally abusive to CB-L. The Mother also reported that she had been raped in the past, and that she was at the time a recovering alcoholic.  The local authority referred the Mother to an assistance program.

23.     In 2014, the family again came to the attention of the police and the local authority as a result of another domestic violence incident with the Mother's partner at the time. The Mother had called the police, who attended at the Mother's home and arrested her then partner for assault. The Mother reported to the police that CB-L had not witnessed that particular assault, but that he had seen other domestic violence incidents between the Mother and her partner.

24.     From 2014 to present, the local authority and police have been involved with the family for various incidents and issues of domestic violence, alcohol abuse and substance abuse.

25.     In June 2015, the Mother presented herself to the emergency department at a local hospital in London, along with her new partner at the time and CB-L, seeking help for withdrawal from alcohol and prescription painkillers. The hospital staff and local authority discussed treatment options with the Mother at the hospital. But she absconded from the hospital with her new partner during the appointment, so a treatment plan was never implemented.

26.     The local authority assessed the family again in 2017 after the police notified the local authority that the Mother had been arrested for shoplifting at Heathrow Airport. The police reported that during the arrest, the Mother reported that she was three months pregnant and that she had been taking Xanax. The police further reported that the Mother smelled of alcohol and that her behavior had been strange during the arrest. The local authority had concerns for CB-L relating to the Mother's alcohol use and prescription painkiller use. But it determined that the concerns did not meet the required threshold for a child protection plan to be put in place at that time.

27.     In or about May 2018, the local authority received another referral relating to the Mother and CB-L after the Mother had again presented at a local hospital emergency department. The Mother's blood test results showed a high level of alcohol in her system. The Mother refused to undergo a drug-screening test.

28.     In 2020 and 2021, the police and local authority involvement with the family increased in frequency and intensity. The Mother made several reports to the police in 2020 and 2021 that a former partner had been harassing and threatening the Mother and CB-L. The police referred the reports to the local authority for investigation.

29.     In January 2021, the Mother became re-connected socially with Timothy Becker, a prominent London barrister. The Mother and Mr. Becker had first met in October 2019, but did not remain in contact because they were each already involved in relationships at the time.

30.     The Mother contacted Mr. Becker in January 2021, and they re-connected and began seeing each other again socially in February 2021.

31.     The Mother told Mr. Becker that she wanted to have another child. Mr. Becker had two adult children already, but he told the Mother that he also wanted to have more children.

32.     When the Mother reconnected with Mr. Becker in February 2021, she was in a relationship with Samuel Ajala. Mr. Becker was in a relationship with another woman. Notwithstanding their respective relationships, the Mother and Mr. Becker had sex on several occasions beginning in February 2021.

33.     The Mother became pregnant in 2021 with the younger child LCJB.

34.     In April 2021, the Mother presented at the local hospital for vaginal bleeding during pregnancy. An unnamed male friend attended at the hospital with the Mother. The local authority became involved because hospital staff reported that the friend was behaving in a controlling manner, pulling on the Mother's arm, and making attempts to be present for the Mother's examination. A hospital staff member also observed the friend hitting the Mother in the hospital corridor. The local authority met with the Mother but she refused any services. The local authority therefore progressed the case internally for a team strategy discussion.

35.     By May of 2021, the Mother and Mr. Becker had each ended their respective other relationships and began their own relationship with each other. At that time, the Mother was pregnant with LCJB. The Mother told Mr. Becker that in addition to having sex with Mr. Becker and with her then-boyfriend during the period of time in which LCJB had been conceived, the

Mother had also used two sperm donors to increase her chances of conception. The Mother's boyfriend at the time of LCJB's conception had been Samuel Ajala.

36.     Between May 2021 and October 2021, the Mother, Mr. Becker, and CB-L spent time together as a family. The Mother and CB-L continued to live in the Mother's home in Belgravia. Mr. Becker lived primarily in his home in Wimbledon. The Mother and Mr. Becker became engaged and planned to be married.

37.     In late June 2021, the local authority again became involved with the family. The Mother had called the police to report concerns that Mr. Ajala was a risk to the Mother because he owned weapons. When the police attended at the Mother's home, she denied making the call to the police and said she did not know why the police where there. The police reported to the local authority that the Mother may have had unmet mental health needs. The local authority therefore progressed its involvement with the family to conduct an assessment.

38.     In early July 2021, the local authority began its assessment by conducting an initial visit to the family. The Mother reported that she may go to the United States or France to give birth to LCJB. The local authority closed its case in early August 2021 because it understood from the Mother that the family would be travelling to the United States.

39.     At the time, the local authority did not have concerns about CB-L's wellbeing. But it noted that it continued to have concerns about the Mother's emotional wellbeing and prescription pain medication dependency.

40.     LCJB was born in London in October 2021. The Mother did not complete the birth registration for LCJB until December 2021. She registered Mr. Becker as the child's father on his birth certificate.

41.     Approximately two weeks after LCJB's birth, the police attended at the Mother's home because she had called to report that a suspect from a sexual assault she had reported to police several months earlier was outside her home. While the police were present, the Mother was standing up and holding LCJB at the top of his legs in an unstable position. LCJB fell backwards onto a wooden floor. The police arranged an ambulance to take the Mother and child to the hospital, and also contacted the local authority.

42.     The local authority met with the Mother at the hospital. Mr. Ajala was also present at the hospital with the Mother and baby. The local authority determined that the family had now met the threshold for a Section 47 Child Protection Enquiry to be conducted. The local authority began its enquiry and also entered into a safety plan with the Mother and Mr. Ajala for LCJB. As a part of the safety plan, it was agreed that Mr. Ajala would live with the Mother and LCJB, and that the Mother was not to be left alone with the baby. The Mother also underwent a drug test while at the hospital and tested positive for benzodiazepines.

43.     In the weeks following the mid-November hospital visit, the local authority continued its Section 47 Child Protection Enquiry assessment. Throughout the weeks of assessments, the local authority frequently observed the Mother to have slurred speech and confusion due to alcohol use.

44.     Mr. Ajala also reported his observations and concerns to the local authority, namely that the Mother had been consuming so much alcohol that she would become incapacitated and unable to care for the baby.

45.     On November 30, 2021, during a local authority social worker home visit, the Mother told the social worker that her relationship with Mr. Ajala had ended in January 2021. The Mother also told the social worker that she and Mr. Ajala had been in conflict the day before

because of the Mother's alcohol use. The Mother also admitted to the social worker that she uses alcohol to manage pain.

46.     For the first week of December 2021, the local authority social workers visited the Mother almost daily at her home. The social workers noted concerns about the Mother's alcohol use while breastfeeding, declining advice and assistance from the local authority's health visitor, her repeated pattern of non-engagement with alcohol-use treatment services, and her presentation with slurred speech and inability to follow conversations.

47.     On December 3, 2021, the social workers spoke with the Mother's fiancé, Mr. Becker. The social worker was concerned that Mr. Becker did not raise any concerns about the Mother's alcohol or pain medication use.

48.     In December 2021, the Mother registered Mr. Becker as the child's father on his birth certificate.

49.     Despite registering Mr. Becker as LCJB's father, the Mother remained in contact with Mr. Ajala, through his involvement in the local authority's safety plan and directly in phone and text correspondence.

50.     In or about mid-December 2021, the Mother told Mr. Ajala that she planned to relocate with LCJB to the United States and that their departure date would be December 17, 2021.

51.     On December 15, 2021, Mr. Ajala initiated private law family proceedings before the English Family Court with respect to the younger child LCJB as to, *inter alia*, paternity, parental responsibility (known in the United States as legal custody), and child arrangements (known in the United States as physical custody).

52.     In those proceedings, Mr. Ajala sought the immediate entry of a *ne exeat* order as to LCJB through a Prohibited Steps Order in the English Family Court. The English Family Court

granted the initial without-notice Prohibited Steps Order on December 15, 2021, prohibiting the Mother from removing LCJB from England & Wales. The Prohibited Steps Order was extended on December 16, 2021 after both parties had notice and opportunity to be heard.

53.     On January 6, 2022, the local authority held its Initial Child Protection Conference with the Mother and the local authority's social work team.  As a result of the conference, a Child Protection Plan was put in place for the children that day. The Child Protection Plan includes social work services for the Mother and children, core group meetings with the social work team, and Review Child Protection Conferences. The first Review Child Protection Conference was scheduled for March 29, 2022.

54.     The local authority began to carry out its services under the Child Protection Plan immediately. It conducted home visits, monitored the children's health and development, and attempted to conduct school visits and drug screening.

55.     The Mother did not cooperate with the hair follicle drug screening, and she withdrew her consent for the social workers to visit CB-L at his school.

56.     CB-L attends the Sussex House School, which is a boys' private preparatory school in Chelsea, London. The school is highly ranked academically and is well-known for its performing arts programs. CB-L thrives at the school, participates in extra-curricular activities, and has many friends at school.

57.     In mid-January 2022, the Mother advised the local authority that she would be travelling to the United States and leaving the children with Mr. Becker in England while she was away.

58.     The local authority continued to carry out its services under the Child Protection Plan. The Mother became even less cooperative over the next two months. She advised the social

workers not to contact her by WhatsApp, continued to refuse hair follicle drug screening, and told the local authority that it has no jurisdiction over her children.

59.     The Mother also refused to cooperate with the local authority's attempts to obtain a child protection medical examination with a full skeletal survey as a result of LCJB's fall in November 2021. The local authority had determined that the examination was necessary after having viewed police bodycam video footage of the fall.

60.     On or about February 23, 2022, the Mother told the local authority that she would be travelling to the United States with the younger child LCJB the following week for six weeks. She also instructed the local authority to contact Mr. Becker to arrange any social work visits with CB-L.

61.     On February 28, 2022, the Mother, Mr. Becker, and the children moved to a new home in London. They moved from Belgravia in the City of Westminster, London to the Kensington & Chelsea borough in London.

62.     The local authority did not learn that the family had moved until the following day. The case was therefore transferred from WCC as the responsible local authority to RBKC as the responsible local authority. There is a bi-borough arrangement between WCC and RBKC, which resulted in a seamless transfer between the local authorities, and allowed the existing child protection plan, and services, albeit that a new Social Work Team became involved.

63.     The Mother's condition worsened in March 2022. Instead of moving into the new apartment with the family, she stayed in a London luxury hotel for a period of time at the beginning of March 2022.

64.     The local authority received a call from the Deputy Head Teacher of CB-L's school expressing concern that the Mother had called the school, and in slurred speech had instructed the

school to have CB-L walk home from school either to the Mother's hotel or to the family's new home.

65.     The local authority social workers visited CB-L at school. CB-L voiced worry and concern for his mother. He also told the social worker about his group of friends at school, about his close relationship with his younger brother, and that he likes the family's new home and has friends nearby.

66.     On March 10, 2022, the private law family proceedings between Mr. Ajala and the Mother were again before the English Family Court. The English Family Court again extended the *ne exeat* Prohibited Steps Order until further order of court, and scheduled the next procedural steps in the case, which were to include DNA testing to determine paternity of the younger child LCJB.

67.     Over the course of the next week, the local authority social workers made several announced and also unannounced visits to the family. The social workers observed the Mother's slurred speech, difficulty balancing, blood shot eyes, incoherent speech, refusal or inability to cooperate with certain health checks relating to the younger child, unsafe co-sleeping with the baby, rough handling of the baby, and an admission of being under the influence of over-the-counter-Tylenol PM during the day. On two occasions (March 11, 2022 and March 17, 2022), the Mother had to be taken to hospital for support.

68.     On March 22, 2022, the local authority conducted a home visit to the Mother and Mr. Becker. During the home visit, Mr. Becker informed the social worker that he had taken the younger child LCJB to the United States on or about March 19, 2022 and left the child there to be cared for by the Maternal Grandmother.

69.     When confronted with the English Court's *ne exeat* Prohibited Steps Order, which prohibited the removal of LCJB from England, the Mother and Mr. Becker took the position that it only prohibited the Mother, and not Mr. Becker, from removing the child to the United States.

70.     The local authority immediately took legal advice and pursued emergency action in the English High Court seeking return of LCJB to England, and seeking a Wardship Order for both children to be made Wards of the English Court, and commencing Care Proceedings as to both children.

71.     On March 22, 2022, the English Court entered an emergency without-notice order making CB-L a Ward of the English Court, and prohibiting his removal from England & Wales.

72.      On March 24, 2022, the English Court held further proceedings at which all parties were provided notice and opportunity to be heard. The Court entered a further order *inter alia* continuing the wardship and  *ne exeat* provisions as to CB-L, ordering the local authority to advise Mr. Ajala of the wardship proceedings, and scheduling further proceedings for April 4, 2022.

73.     On April 4, 2022, the English High Court entered its first return order, requiring the Mother and Mr. Becker to return, or arrange for the return, of LCJB to the jurisdiction of England & Wales by midnight on April 11, 2022. The English High Court continued its wardship of CB-L, and also made LCJB a Ward.

74.     The Mother did not return LCJB to the jurisdiction of England & Wales as ordered.

75.     On April 29, 2022, the English High Court entered a further order. It designated the RBKC as the applicant local authority in proceedings relating to CB-L and LCJB moving forward.

76.     In the April 29, 2022 order, the English Court also: (A) joined Mr. Ajala as a party to the Wardship Proceedings: (B) linked the private law family proceedings, Wardship Proceedings, and Care Proceedings; and (C) scheduled further proceedings for June 10, 2022.

77.     Instead of complying with the English High Court's orders, the Mother removed CB-L from England in or about early May 2022.

78.     RBKC then filed an application in the English High Court seeking the return of CB-L to the jurisdiction of England & Wales.

79.     On or about May 11, 2022, the Maternal Grandmother, who lives in New York, filed a petition in the New York Family Court seeking, upon information and belief, custody of LCJB, but not CB-L. The New York Family Court entered a temporary order on May 12, 2022 for the Maternal Grandmother to have temporary custody of LCJB, notwithstanding the English Court's already-existing orders. The New York Family Court entered a further order on July 28, 2022 prohibiting the Maternal Grandmother from leaving LCJB alone with the Mother. A status conference is scheduled in the New York Family Court case on September 30, 2022.

80.     The English High Court held an initial hearing on May 25, 2022 on RBKC's application seeking return of CB-L. The English High Court scheduled a further hearing for June 10, 2022.

81.     At the hearing on June 10, 2022, the English High Court received the DNA test results, which confirm that Mr. Ajala is the father of LCJB, and not Mr. Becker. The English High Court also received confirmation that the Mother had removed CB-L from England & Wales.

82.     On June 10, 2022, the English High Court entered a further order requiring the Mother to return CB-L to the jurisdiction of England & Wales by midnight on June 21, 2022.

83.     The Mother did not comply with the June 10, 2022 order.

84.     The English High Court entered further orders on July 8, 2022, July 26, 2022, August 8, 2022, and August 23, 2022, all of which required the Mother to return or effectuate the return of the children to the jurisdiction of England & Wales from the United States.

85.     The Mother has not complied with any of the return orders entered by the English Court, thereby necessitating this Petition for Return in this honorable Court.

86.     On August 26, 2022, after having obtained the High Court's orders permitting disclosure of the English pleadings and papers, RBKC submitted its Hague Convention Application to the Central Authority for England & Wales (known as "ICACU"). The Application was transmitted to the United States Central Authority, which is the United States Department of State Office of Children's Issues.[4]

87.     RBKC has promptly taken all legal actions available to it to seek the return of the children to England.

## V.      COUNT I – WRONGFUL REMOVAL (BOTH CHILDREN)

88.     RBKC restates and re-alleges the allegations contained in Paragraphs 1-87

89.     The Convention applies to cases where a child under the age of 16 is removed or retained from his or her habitual residence in breach of 'rights of custody' that were being exercised at the time of the wrongful removal or wrongful retention of the child.

90.     The children in this matter are under the age of 16.

91.     The habitual residence of the children is England, and was England on or about March 19, 2022 (the date of LCJB's removal), and on or about early May 2022 (upon information and belief the date of CB-L's removal).

---

[4] RBKC had previously submitted a Hague Application on June 23, 2022. Upon receipt of the Application, however, the United States Central Authority advised RBKC that it had information to confirm that the children were no longer located in the United States and the Application therefore could not be processed. The United States Central Authority has now accepted that the children are indeed located in the United States. RBKC has therefore submitted a Second Application to the United States Central Authority.

92.     The children have lived nearly their entire lives in England. RBKC records indicate that the older child CB-L has lived in England from at least 2010 until the date of his removal. LCJB was born in England and has lived in England from his birth until the date of his removal.

93.     The older child CB-L attends the Sussex House School, which is a boys' private preparatory school in Chelsea, London. The school is highly ranked academically and is well-known for its performing arts programs. CB-L thrives at the school, participates in extra-curricular activities, and has many friends at school.

94.     The children are currently under the protection of RBKC, through a child protection plan that has been in place since January 6, 2022.

95.     Both children are the subjects of Care Proceedings (similar to proceedings known in the United States as child protection proceedings or child in need of assistance proceedings) in the English High Court in case number ZC22C00081.

96.     Both children are also the subjects of Wardship Proceedings in the English High Court in case number FD22P00223. Wardship Proceedings are matters in which a local authority or other person seeks for the English High Court to exercise its inherent jurisdiction to protect a child. When a child is made a Ward of the English High Court, the English High Court has parental responsibility for the child. Both children here are Wards of the English High Court. The older child CB-L was made a Ward of the English High Court on March 22, 2022. The younger child LCJB was made a Ward of the English High Court on April 4, 2022.

97.     In Wardship Proceedings, a local authority with the English High Court's permission (here, RBKC) can serve as the Applicant in any proceedings relating to the children. The English High Court is a holder of parental responsibility for its Wards and designates the local authority as the party/applicant for proceedings relating to the Wards in accordance with the

English High Court's Procedural Rule 12.3. The English High Court has designated the RBKC as the applicant local authority in proceedings relating to CB-L and LCJB.

98.     The Care Proceedings and Wardship Proceedings have been linked together by the English High Court and are listed together for any and all proceedings before the English High Court.

99.     The younger child LCJB is also the subject of private law family proceedings now before the English High Court in case number ZC21P01740. The private law family proceedings had been pending before the English Family Court since December 2021 as to, *inter alia*, paternity, parental responsibility (known in the United States as legal custody), and child arrangements (known in the United States as physical custody).

100.    *Ne exeat* Prohibited Steps Orders have been in effect in the private law family proceedings since December 15, 2021 prohibiting the removal of LCJB from the jurisdiction of England & Wales. The private law family proceedings as to LCJB have now been transferred to the English High Court. The English High Court has linked the private law family proceedings as to LCJB with the Care Proceedings and Wardship Proceedings for both children.

101.    *Ne exeat* orders are also contained within the English High Court's orders in the Care Proceedings and Wardship Proceedings and have been in effect as to the older child CB-L since March 22, 2022.

102.    At the time the Mother removed the children from England, the English High Court had, and continues to have, 'rights of custody' to the children under English law in accordance with the Children Act 1989, the Senior Courts Act 1981, the Inherent Jurisdiction of the English High Court, and certain related statutory instruments.

103.    Notice is therefore given in this pleading that RKBC is relying upon foreign law. FED. R. CIV. PROC. 44.1.

104.    Both children have been under the protection of RBKC (and its predecessor WCC), through a child protection plan that has been in place since January 6, 2022.

105.    The children are both wards of the English High Court. The English High Court is vested with 'rights of custody,' namely parental responsibility for the children, that are attributable to RBKC through RBKC's designation as applicant party by the English High Court because a court cannot act as a party.

106.    Parental Responsibility is defined in the Children Act 1989, Part 1 Section 3 as "all the rights duties powers responsibilities and authority which by law a parent of a child has in relation to the child and his property."

107.    Parental responsibility, as it is defined, necessarily involves the "care of the child" and is therefore a right of custody under Article *5a* of the Hague Convention.

108.    Parental responsibility is an article 5*a* right of custody.

109.    In addition, the English High Court has had *ne exeat* orders in place with respect to LCJB since December 15, 2021 and with respect to CB-L since March 22, 2022.

110.    A *ne exeat* right is an article 5*a* right of custody.

111.    From April 2022 through August 2022, the English High Court has repeatedly ordered the return of the children to England. The English High Court has ordered RBKC to proceed as the applicant in Hague proceedings in order to obtain the children's return to England & Wales. RBKC therefore has 'rights of custody' that the English High Court has attributed to RBKC in accordance with article 3 of the Convention.

112.     The English High Court's most recent order for the return of the children, entered on August 23, 2022, provides that the children remain Wards of the English High Court and that the Mother must return the children, or effect the return of the children, to the jurisdiction of England & Wales by midnight on August 31, 2022. She has not done so.

113.     The same order further provides as follows:

**THE COURT RESPECTFULLY REQUESTS THAT**

3.     The state and federal judicial and administrative authorities of the United States of America cooperate and assist in securing the return of the children to the jurisdiction of England & Wales in accordance with this Order.

4.     The Judge who has conduct of any court proceedings in the United States of America in relation to either child is shown this Order and the Court gives permission for the case papers in these proceedings to be disclosed to the Judge presiding over proceedings with regard to these subject children.

114.     The removal of the children from their habitual residence of England is in breach of the English High Court's and RBKC's 'rights of custody' and is therefore wrongful.

115.     At the time of the wrongful removal of the children, the English High Court (and its predecessor the English Family Court), and RBKC through its designation as local authority applicant, were actually exercising 'rights of custody' within the meaning of Articles 3 and 5*a* of the Convention. The English Family Court and later the English High Court have entered *ne exeat* orders relating first to the younger child LCJB and later relating to the older child CB-L. The English High Court has entered orders for both children to be returned from the United States to England. RBKC has a child protection plan for both children, has actively worked with the family in England to create a care plan for the children, has actively pursued litigation in the English High Court seeking the return of the children after the removal, and has served as the local authority applicant as to both children as ordered by the English High Court.

116.    Neither the English High Court nor RBKC has ever acquiesced or consented to the removal of the children from England to the United States.

117.    Upon return, RBKC's plan is for the Mother and children to remain together, in a placement called a "Reverse Parenting Assessment." This placement involves live-in assessors, and the assessment would take approximately 12 weeks.

## VI.    COUNT II – WRONGFUL RETENTION (LCJB)

118.    RBKC restates and re-alleges the allegations contained in Paragraphs 1-116.

119.    LCJB is under the age of 16.

120.    LCJB's habitual residence is England, and was England on or about April 12, 2022 (the date of LCJB's retention).

121.    LCJB has lived nearly his entire life in England. LCJB was born in England and had lived in England from his birth until the date of his removal from England, and thereafter retention, in the United States.

122.    The younger child LCJB was made a Ward of the English High Court on April 4, 2022.

123.    On April 4, 2022, the English High Court ordered the Mother to return the younger child LCJB to the jurisdiction of England & Wales by midnight on April 11, 2022.

124.    The Mother did not return LCJB to the jurisdiction of England & Wales as ordered.

125.    The English High Court entered further orders on April 29, 2022, June 10, 2022, July 8, 2022, July 26, 2022, August 8, 2022, and August 23, 2022 all of which required the Mother to return the younger child LCJB to the jurisdiction of England & Wales.

126.    The Mother has therefore retained the younger child LCJB in the United States from his habitual residence of England from April 12, 2022 to present.

127.    The younger child LCJB is a Ward of the English High Court. The English High Court is vested with 'rights of custody,' namely parental responsibility for the children, that are attributable to RBKC through RBKC's designation as applicant party by the English High Court, because a court cannot act as a party.

128.    The retention of LCJB from his habitual residence of England is in breach of the English High Court's and RBKC's 'rights of custody' and is therefore wrongful.

129.    At the time of the wrongful retention of LCJB, the English High Court and RBKC through its designation as local authority applicant, were actually exercising 'rights of custody' within the meaning of Articles 3 and 5*a* of the Convention. The English Family Court and later the English High Court have entered *ne exeat* orders relating to the younger child LCJB. The English High Court has entered orders for LCJB to be returned from the United States to England. RBKC has a child protection plan for LCJB, has actively worked with the family in England to create a care plan for LCJB, has actively pursued litigation in the English High Court seeking the return of LCJB to England, and has served as the local authority applicant as to LCJB as ordered by the English High Court.

130.    Neither the English High Court nor RBKC has ever acquiesced or consented to the retention of LCJB in the United States from England.

## VII.    COUNT III – ARTICLE 18 RETURN

131.    RBKC invokes Article 18 of the Convention, which grants this Court plenary power to order the children's return at any time.

## VIII.   UCCJEA DECLARATION

132.    To the best of RBKCs knowledge, the details regarding the children that are required to be provided under the New York Uniform Child Custody Jurisdiction and Enforcement Act ("UCCJEA") are as follows:

A.    The children are currently located with the Mother at the following address: 20 East 74th Street, Apt. 6E, New York, New York, 10021, and from time to time at 90 Prince Street, New York, NY 10012.

B.    Upon information and belief: (A) the younger child LCJB has been located at the addresses stated above since on or about March 19, 2022, with the Maternal Grandmother until on or about May 16, 2022 and thereafter, with the Mother and the Maternal Grandmother; and (B) the older child CB-L has been located at the addresses stated above since on or about May 16, 2022 with the Mother and the Maternal Grandmother. In addition, upon information and belief, New York counsel for the Maternal Grandmother in the state court proceedings is able to confirm the whereabouts of the Mother.

C.    From the time of their respective births until the children were each removed from England: (A) RBKC records indicate that the older child CB-L has lived in England from at least 2010 until the date of his removal, at various addresses in England with the Mother; and (C) LCJB was born in England and has lived in England from his birth until the date of his removal, at various addresses in England with the Mother. The Maternal Grandmother has also spent regular time with the children in England.

D.    RBKC does not have information of any custody proceeding concerning the children pending in any other court of this or any other State, other than the information provided in this Verified Petition.

E.      RBKC does not know of any person or institution not a party to the proceedings that has physical custody of the children or claims to have rights of parental responsibility or legal custody or physical custody of, or visitation or parenting time with the children, other than the information provided in this Verified Petition.

## IX.      NOTICE OF HEARING

133.    Pursuant to 22 U.S.C. 9003(c), the Mother will be given notice of any hearing in accordance with New York's UCCJEA.

## X.   ATTORNEYS' FEES AND COSTS INCLUDING TRANSPORTATION EXPENSES PURSUANT TO CONVENTION ARTICLE 26 AND ICARA § 9007

134.    RBKC, a public body, has incurred substantial expenses as a result of the wrongful removal of the children by the Mother.

135.    RBKC respectfully requests that this Court award it all of its reasonable and necessary attorneys' fees, expenses, and costs incurred in accordance with ICARA § 9007, upon the filing of a separate motion for reasonable and necessary expenses and costs in accordance with the Federal Rules of Civil Procedure and this Court's Local Rules.

## RELIEF REQUESTED

**WHEREFORE**, the Petitioner, the Royal Borough of Kensington and Chelsea, respectfully requests the following relief:

A.      That this Verified Petition be granted; and

B.      That this Court issue an order directing the prompt return of the children to their habitual residence of England; and

C.      That this Court issue an order prohibiting the removal of the children from the jurisdiction of this Court and the taking into safe-keeping of the children's passports and travel documents during the pendency of the proceedings in this Court; and

     D.     That this Court grant any such further relief as justice and RBKC's cause may require.

**VERIFICATION**

PURSUANT TO 28 U.S.C.A. §1746, I DECLARE UNDER THE PENALTY OF PERJURY UNDER THE LAWS OF THE UNITED STATES OF AMERICA THAT THE FOREGOING IS TRUE AND CORRECT.

EXECUTED ON SEPTEMBER 28, 2022.

**ROYAL BOROUGH OF KENSINGTON AND CHELSEA**
*Petitioner*

BY:   _____
     Alexandra Handford
     Head of Service
     Royal Borough of Kensington and Chelsea


Respectfully Submitted,

/s/ Jessica A. duHoffmann
Jessica A. duHoffmann, Atty. Bar Code # 63600
Miles & Stockbridge P.C.
100 Light Street
10th Floor
Baltimore, MD 21202
(410) 385-3782
jduhoffm@milesstockbridge.com

Stephen J. Cullen, *Pro Hac Vice Pending*
Kelly A. Powers, *Pro Hac Vice Pending*
Miles & Stockbridge P.C.
1201 Pennsylvania Avenue, N.W.
Suite 900
Washington, DC 20004
(202) 465-8374
(410) 385-3709 (fax)
scullen@milesstockbridge.com
kpowers@milesstockbridge.com

*Attorneys for Petitioner*