**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

**ROYAL BOROUGH OF**
**KENSINGTON AND CHELSEA**              *

      **Petitioner,**                          *

**v.**                                          *

                                   **Civil No. 1:22-cv-8303**

**TARA BANFA-LOUIS**                      *

      **Respondent.**                         *

*   *   *   *   *   *   *   *   *   *   *   *   *

**PETITIONER'S PRETRIAL BRIEF**

      Petitioner, Royal Borough of Kensington and Chelsea ("RBKC"), by and through its undersigned attorneys, and in accordance with the Court's Expedited Scheduling Order, files this Pretrial Brief, and states as follows:

**I.**      **Factual Summary.**[1]

      The children are CB-L (male; born in 2009) and LCJB (male; born in 2021). Both children have lived in England for nearly their entire respective lives. The English local authorities, which are delegated local governmental organizations with Social Work Teams, have been involved with the family since 2010. The local authority for the family's district based on their address had been the Westminster City Council ("WCC") until the family moved into the district handled by RBKC on February 28, 2022. RBKC took over for WCC upon the family's move into its district. WCC had a child protection plan in place for both children at the time of the move. RBKC therefore took over the child protection plan that WCC had put in place to protect the children. The local

---

[1] This Factual Summary is intended to provide the Court with the context for the legal analysis contained in this Pretrial Brief. This contextual summary is not intended to be all-inclusive, nor to limit or preclude any probative evidence from being offered at trial.

authorities have been involved with the family over the course of the last nearly 13 years as a result of the Mother's very serious substance abuse issues, their safety concerns for the one then both children, and certain domestic violence claims the Mother has made against former partners in England.

The older child's father is not and never has been involved in his life. It is believed that he lives in Russia. The Mother had named her then-partner, English barrister Timothy Becker, as the younger child's father on the younger child's birth certificate after the younger child's birth.

The family came to the attention of the English judicial system in December 2021 when the younger child's biological father, Samuel Ajala, initiated private law proceedings in the English Family Court to establish his paternity and other contact arrangements for the younger child. On December 15, 2021, the English Family Court entered a Prohibited Steps Order in relation to the younger child, which prohibited the removal of the younger child from England. On March 10, 2022, the English Family Court extended the Prohibited Steps Order in relation to the younger child until further order of court. The Prohibited Steps Order remains in full force and effect.

On March 19, 2022, the Mother removed the younger child from England to the United States in violation of the Prohibited Steps Order. Her then-partner, Timothy Becker, facilitated the removal of the child on behalf of the Mother by transporting the younger child to the United States.

On March 22, 2022 and again on April 4, 2022, the English High Court made the older child CB-L a ward of court, and it prohibited CB-L's removal from England by way of a Prohibited Steps Order for CB-L. On April 4, 2022, the English High Court also made the younger child, LCJB a ward of court and ordered the Mother to return him to England. She continues to refuse to do so, which refusal has resulted in this case.

On April 29, 2022, the English High Court ordered that RBKC be designated as the applicant local authority in all proceedings relating to both children.

The Mother removed the older child CB-L from England to the United States on or about early May 2022. The Mother and children have not returned to England. The English High Court has entered a raft of orders between April 2022 and December 2022 requiring the Mother to return the children to England. She has not done so. RBKC therefore pursues this Hague Convention return case at the direction of the English High Court, seeking the return of both children to England.

## II.     RBKC Has Standing to Bring This Hague Convention Case.

RBKC is the proper party to bring this matter to the court for adjudication, and is the entity entitled to have the court decide the merits of the dispute and the particular issues in this case. *Warth v. Seldin*, 422 U.S. 490, 498 (1975); *Federal Jurisdiction*, § 2.3.1 (Erwin Chemerinsky, 6th ed. 2012); *see also, e.g., E. Sussex Children Servs. v. Morris*, 919 F. Supp. 2d 721 (N.D. W. Va. 2013) (local authority pursued Hague Convention case as explained in § III(C) *infra*).

RBKC satisfies the three constitutional standing requirements: (1) the litigant must allege it has suffered an injury (Doc. 1 at ¶¶ 114-116; 128-130); (2) the litigant must allege the injury is fairly traceable to the opposing party's conduct (Doc. 1 at ¶¶ 102, 124); and (3) the litigant must allege that a favorable federal court decision is likely to redress the injury (Doc. 1 at p. 24 ¶¶ A-D). *See Bennett v. Spear*, 520 U.S. 154, 167 (1997).

Article 3 of the Hague Convention provides that "an institution or other body" is within the category of persons or entities who may seek the return of a child. Convention, art. 3*a*. It is undisputed that both children in this case are wards of the High Court in England and that RBKC is the Local Authority involved with the family. The High Court has held, through the entry of its

Hague Convention Article 15 Declaration,[2] that RBKC is therefore the proper party to pursue return of the children. The High Court explained as follows in its Article 15 Declaration:

> The Local Authority has locus to bring an application for the summary return of the wards to the jurisdiction of England and Wales on behalf of the court pursuant to the guidance of the House of Lords in Re H (A Minor)(Abduction: Rights of Custody) [2000] 2 AC 291 and the High Court in X County Council v. B (Abduction: Rights of Custody in the Court) [2010] 1 FLR 1197.

(Doc. 25-1 at p. 4 ¶ 3).

RBKC therefore has standing to pursue the return of the children to England in this Hague Convention proceeding.

## III.   Petitioner's *Prima Facie* Case.

## A.   Hague Convention Standards.

The Hague Convention was adopted to address and discourage the problem of international unilateral action by one parent. *See Lozano v. Montoya Alvarez*, 572 U.S. 1, 4 (2014). Through the adoption of the Hague Convention, the States Parties, including England (as part of the United Kingdom) and the United States, have sought "to protect children internationally from the harmful effects of their wrongful removal or retention and to establish procedures to ensure their prompt return to the State of their habitual residence." Hague Convention, preamble; *see also* Hague Convention, art. 1; ICARA § 9001; *Abbott v. Abbott*, 560 U.S. 1, 8 (2010); *Ermini v. Vittori*, 758 F.3d 153, 160 (2d Cir. 2014); *Velozny v. Velozny*, 550 F. Supp. 3d 4, 13 (S.D.N.Y. 2021).

---

[2] *See* United States Department of State Legal Analysis, 51 Fed. Reg. 10494, 10508 (Article 15 of the Convention permits the court determining the Hague Convention case to request that the petitioner obtain from the authorities, which includes courts, of the child's habitual residence, a decision or other determination that the alleged removal or retention was wrongful within the meaning of article 3 of the Convention).

The primary purpose of the Hague Convention is "to restore the pre-abduction status quo." *Chafin v. Chafin*, 568 U.S. 165, 169-70 (2013); *Velozny*, 550 F. Supp. 3d at 13. "The Convention's central operating feature is the return remedy." *Abbott* 560 U.S. at 9. When there has been a wrongful [removal or] retention, the country to which the child has been removed generally must order the prompt return of the child. *Id.*

The scope of a court's inquiry under the Hague Convention is limited to the merits of the claim for wrongful removal or retention. Hague Convention, art. 16, 19; ICARA § 9001(b)(4). The merits of any underlying custody case are therefore not at issue and cannot be considered. *Velozny*, 550 F. Supp. 3d at 13 (citing *Mota v. Castillo*, 692 F.3d 108, 112 (2d Cir. 2012)). The return remedy therefore "lays venue for the ultimate custody determination in the child's country of habitual residence rather than the country to which the child is abducted." *Lozano*, 572 U.S. at 5.

The International Child Abduction Remedies Act ("ICARA") is the Convention's implementing legislation in the United States. It establishes straightforward procedures for the operation of the Hague Convention in the United States by defining and allocating burdens of proof for claims and discretionary exceptions under the Convention. ICARA § 9001 *et seq.* ICARA requires that a petitioner under the Hague Convention establish, by a preponderance of the evidence, that the child whose return is sought has been "wrongfully removed or retained within the meaning of the Convention." ICARA § 9003(e)(1)(A).

In order to establish a prima facie case of wrongful removal under the Convention and ICARA, RBKC is to establish by a preponderance of the evidence that: (1) the habitual residence of the children at the time of the removal was England; (2) the removal breached the English Court's semi-autonomous article 5*a* 'rights of custody' under English law; and (3) the English Court, itself and through RBKC, was exercising 'rights of custody' at the time of the removal or

would have been so exercising its rights but for the removal. Convention, art. 3. When RBKC establishes by a preponderance of the evidence that the Mother's removal of the children was wrongful within the meaning of the Convention, the children's return is required forthwith pursuant to article 12 of the Convention, unless in its discretion the Court sustains one or more of the narrow exceptions to return.

**B.      The Children's Habitual Residence Was England on the Date of Removal.**

In 2020, the Supreme Court issued its opinion in the *Monasky v. Taglieri* case, holding that ". . . a child's habitual residence depends on the totality of the circumstances specific to the case." *Monasky*, 140 S. Ct. 719, 723 (2020). In so holding, the Supreme Court adopted a uniform standard, similar to the standard that had been employed by the Seventh Circuit, which rejected "rigid rules, formulas, or presumptions" in making habitual residence determinations. *Redmond v. Redmond*, 724 F.3d 729, 746 (7th Cir. 2013).

In its discussion of habitual residence, the *Monasky* Court explained that in general, a child "resides where she lives." *Monasky*, 140 S. Ct. at 726. The term "habitual" suggests a fact-sensitive inquiry. *Id*. "Because locating a child's home is a fact-driven inquiry, courts must be sensitive to the unique circumstances of the case and informed by common sense." *Id*. (citing *Redmond*, 724 F.3d at 744). The Supreme Court has instructed that no single fact is dispositive across all cases. *Id*. It has further instructed that:

> Common sense suggests that some cases will be straightforward:
> Where a child has lived in one place with her family indefinitely,
> that place is likely to be her habitual residence.

*Monasky*, 140 S. Ct. at 727 (citing *Karkkainen v. Kovalchuk*, 445 F.3d 280, 291 (3rd Cir. 2006)).

The drafting history of the Convention is instructive as to how a court analyzes the totality of the circumstances in making a habitual residence determination. *Monasky*, 140 S. Ct. at 727.

6

The drafters intentionally chose the phrase "habitual residence" for its "factual character, making it the foundation for the Convention's return remedy in lieu of formal legal concepts like domicile and nationality." *Id*. (citing Anton, 30 Int'l & Comp. L. Q. 537, 544 (1981) (history of the Convention authored by the drafting commission's Chairman)). The Supreme Court explained that the drafter's choice is instructive because it indicates that the signatories "sought to afford the courts maximum flexibility to respond to the particular circumstances of each case." *Id*. (citations omitted). The Supreme Court then summarized the analysis stating "[t]he bottom line: there are no categorical requirements for establishing a child's habitual residence . . ." *Id*. at 728.

The evidence to be adduced at the evidentiary hearing will establish that this case is one of the straightforward habitual residence analyses anticipated by the *Monasky* Court. The children have lived in England for nearly their entire lives. RBKC (and its predecessor Local Authority the WCC) has been involved in assisting and providing services to the family since 2010, when the older child CB-L was only one year old. The older child attends school in England, plays sports and participates in other extracurricular activities in England, and has friends in England. Both children receive health care in England. Custody litigation has been pending in the English courts since December 2021 as to the younger child LCJB, and since April 2022 as to the older child CB-L. The English court has prohibited the removal of both children from England & Wales and both children are wards of the English High Court. RBKC has care plans in place for both children. The children are both fully integrated into English daily life. The totality of the circumstances establishes that England was each child's habitual residence on the date of each child's respective removal from England.

**C.      Rights of Custody to the Children Under English Law.**

After determining the children's habitual residence, the Court next considers the 'rights of custody' to the children at the time of each child's removal. Whether a petitioner has article 5*a* 'rights of custody' to a child is determined based upon the law of the child's habitual residence. Under the Convention, "removal or retention of a child is deemed wrongful when it is in breach of rights of custody attributed to a person, an institution or any other body, either jointly or alone, under the law of the State in which the child was habitually resident immediately before the removal." Convention, art. 3*a*; *Ermini*, 758 F.3d at 161. 'Rights of custody' include "rights relating to the care of the person of the child and, in particular, the right to determine the child's place of residence." Convention, art. 5. A *ne exeat* order is a 'right of custody' under article 5*a* of the Hague Convention. *See Abbott*, 560 U.S. at 11-14.

Rights of custody are to be construed broadly. "The Convention's intent is for courts to invoke in the widest possible sense the law of the child's habitual residence." *Palencia v. Perez*, 921 F.3d 1333, 1339 (11th Cir. 2019) (citing Elisa Pérez-Vera, Explanatory Report on the 1980 Hague Convention on the Civil Aspects of International Child Abduction ¶ 67 (1982)).[3] The intention of the Convention is ". . . to protect *all* the ways in which custody of children can be exercised, and the Convention favors a flexible interpretation of the terms used, which allows the greatest possible number of cases to be brought into consideration." *Id*. (emphasis in original) (citing *Hanley v. Roy*, 485 F.3d 641, 645 (11th Cir. 2007)). "The violation of a *single* custody right suffices to make

---

[3] The Pérez-Vera Report is the official commentary to the Convention. *Simcox v. Simcox*, 511 F.3d 594, 604, n.3 (6th Cir. 2007) (quoting United States Department of State Legal Analysis, 51 Fed. Reg. 10494, 10503 ("Professor Perez-Vera's explanatory report is recognized by the [Hague Conference on Private International Law] as the official history and commentary on the Convention and is a source of background on the meaning of the provisions of the Convention available to all States becoming parties to it.")).

removal wrongful." *Palencia*, 921 F.3d at 647 (emphasis in original and citations omitted). "Although a vast majority of [Hague Convention] cases involve parents or relatives claiming custody rights, administrative agencies or other bodies may claims custody rights." *E. Sussex Children Servs. v. Morris*, 919 F. Supp. 2d 721, 730 (N.D. W. Va. 2013) (citations omitted).

In *East Sussex*, the local authority involved with the family (East Sussex Children Services), had enacted a child protection plan for the child in February 2010 and regularly monitored the child's well-being in accordance with the plan. *Id*. at 726. Proceedings relating to the child's care, residence, and contact then began in England October 2010, first in the local county court and later in the English High Court. *Id*. On February 1, 2012, the local county court in England entered a *ne exeat* order, which required the mother to lodge the child's passport with the court to prohibit the mother from removing the child from England. *Id*. The mother lodged her passport with her solicitor, which the court accepted as compliance with its order. *Id*. Shortly thereafter, the Mother obtained a replacement passport for the child by claiming to the passport agency that the child's passport had been lost. *Id*. On June 1, 2012, the mother removed the child from England, travelled through Canada, and entered the United States on June 4, 2012. *Id*. On June 11, 2012, a social worker from East Sussex conducted an unannounced visit to the mother's home and discovered that the mother and child had left the address. *Id*. The county court in England held an emergency hearing and entered an Interim Care Order placing the child in the care of East Sussex, and granting East Sussex parental responsibility for the child. *Id*. Further court proceedings were conducted in the county court and the High Court. *Id*. at 727.

After confirming that the mother had removed the child from England to West Virginia, East Sussex filed its Hague Convention petition for return in federal court in West Virginia, seeking return of the child to England. *Id*. The mother argued that she had "sole custody" of the

child at the time of the removal because the Interim Care Order had not yet been entered, and that the removal was therefore not wrongful. *Id*.

The federal court held that the local authority had established the 'rights of custody' element of its *prima facie* case because there had been a child protection plan in place and a *ne exeat* order entered by an English court at the time of the child's removal from England. *Id*. at 730-33. It held that East Sussex had rightly asserted the English court's 'rights of custody' under the Convention based upon the child protection plan and *ne exeat* order being in place at the time of the removal. *Id*. The court further explained that the English county court's *ne exeat* order "conferred rights of custody upon the [English] court." *Id*. It held that East Sussex, as the local authority in the case, could assert the court's custody rights to determine the child's residence, *i.e.*, to prohibit the removal of the child from England. *Id*. The federal court further explained that the fact the Interim Care Order was entered after the removal has no bearing on the rights of custody analysis, because the child protection plan and *ne exeat* order established rights of custody. *Id*.

So here. The evidence to be adduced at the evidentiary hearing will establish that a child protection plan was in place for each child, through RBKC (and its predecessor WCC), at the time of each child's removal. And that *ne exeat* orders had been entered by the English courts as to each child prior to the time of each child's removal. The child protection plan had been in place with respect to both children since on or about January 6, 2022. In December 2021, the English Family Court entered a *ne exeat* order as to the younger child LCJB. The Mother removed LCJB from England on or about March 19, 2022. The English High Court entered a *ne exeat* order as to the older child CB-L on March 22, 2022. The Mother removed CB-L from England on or about early May 2022.

Here, as in *East Sussex*, RBKC is asserting the English court's 'rights of custody' by pursuing the return of the children to England. Evidence to be adduced at the evidentiary hearing on English law—two Affidavits of English Law addressing rights of custody, and the English High Court's Article 15 Declaration—establish the 'rights of custody' element of RBKC's *prima facie* case. Any other international law analysis would be illogical and would result in English court orders becoming unenforceable upon the removal or retention of children in violation of such orders in cases involving local authorities.

In considering whether a party has 'rights of custody' the Court may "take notice directly of the law of, and of judicial or administrative decisions, formally recognized or not in the State of the habitual residence of the child, without recourse to specific procedures for the proof of that law or for the recognition of foreign decision which would otherwise be applicable." Convention, art. 14; *see also* FRCP 44.1; *see also E. Sussex Children Servs.*, 919 F. at 729 (N.D. W. Va. 2013). The Court may consider affidavits of foreign law to establish rights of custody. *Whallon v. Lynn, 230* F.3d 450, 455 (1st Cir. 2000). This Court has ordered that RBKC may submit declarations on English law by English solicitors, provided that such declarations comply with the notice requirements of Rule 44.1. (Doc. 30 at p. 2). The Court further ordered that the live appearance of the solicitors is not necessary. *Id*.

RBKC has filed two Affidavits of English Law executed by a solicitor licensed to practice law in England to establish rights of custody. (Doc. Nos. 14-1, 35-1). RBKC has filed the English High Court's Article 15 Declaration. (Doc. No. 25-1); *see also* § 1 *supra*. RBKC incorporates by reference herein the Affidavits of English Law and the Article 15 Declaration previously filed in this matter confirming the English court's 'rights of custody' on the date of each child's removal, which are properly asserted by RBKC. (Doc. No. 1 at ¶¶ 102-114; Doc Nos. 14, 35, 36, 37).

11

**D.      Exercising Rights of Custody.**

The final element of RBKC's *prima facie* case is that the 'rights of custody' were being exercised at the time each child was removed from England, or would have been exercised but for the removal. 'Rights of custody' are only to be considered not exercised by a petitioner if the children have been abandoned. *Sealed Appellant v. Sealed Appellee*, 394 F.3d 338, 344 (5th Cir. 2004). No such evidence can be adduced because there has been no such abandonment here. Neither the English Court, nor RBKC has ever abandoned the children. They have done all in their power to safeguard the children.

The evidence therefore establishes all three elements required under the Hague Convention to establish by a preponderance of the evidence standard that the children were wrongfully removed from England. The Convention therefore requires that the children be returned to England forthwith. Convention, art. 12. The return remedy is the only remedy available under the Convention. The Court may only decline to return the children if the Mother can establish one of the five narrow discretionary exceptions to return, which RBKC submits she will be unable to do at the evidentiary hearing.

**IV.      <u>None of the Narrow Discretionary Exceptions Apply</u>.**

There are certain narrow discretionary exceptions to return under the Convention, that allow a Court in its discretion to decline to return a child even when a petitioner has met its burden of establishing a wrongful removal by a preponderance of the evidence. *See* Convention arts. 13 and 20. None of these discretionary exceptions apply here. The exceptions and other defenses the Mother asserts in her Answer are addressed below.

12

A.      **The Mature Child's Objection.**

1.      **The two-pronged test.**

The Court may decline to return a child to the child's habitual residence based on this exception only ". . . if it finds that the child *objects* to being returned *and* has attained an age and degree of maturity at which it is appropriate to take account of its views." *Rodriguez v. Yanez*, 817 F.3d 466, 473 (5th Cir. 2016); Hague Convention art. 13 (emphasis added). The Mother has the burden to establish by a preponderance of the evidence that this exception applies. ICARA § 9003(e)(2)(B).

To carry this burden, the Mother must "establish two distinct facts" with respect to each child: (1) that the child has reached an age and degree of maturity at which it is appropriate to take account of his views; and (2) that the child objects to returning to England. *Rodriguez*, 817 F.3d at 473-74. As with all exceptions to return, this exception must be construed narrowly. *Id*. at 474. The Mother cannot meet her burden on either prong.

The Mother will be unable to adduce evidence to establish that the older child[4] has reached an age and degree of maturity at which it is appropriate to take account of his views. Although the child is 13 years of age, the Convention provides no specific age at which a child is deemed sufficiently mature for his views to be considered. *Haimdas v. Haimdas*, 720 F. Supp. 2d 183, 205 (E.D.N.Y. 2010); *see also Yang v. Tsui*, 499 F.3d 259, 279 (3rd Cir. 2007). "Given the fact-intensive and idiosyncratic nature of the inquiry, decisions applying the age and maturity exception are understandably disparate." *Haimdas*, 720 F. Supp. 2d at 205 (quoting *De Silva v. Pitts*, 481 F.3d 1279, 1287 (10th Cir. 2007)).

---

[4] This exception is inapplicable, and the Mother does not assert it, as to the younger child, who is only two years old.

The State Department explains in its Legal Analysis of the Convention that a child's objection to being returned may be "accorded little if any weight" if it is the product of the retaining parent's undue influence over the child. 51 Fed. Reg. at 10510. "Such influence need not be intentional or sinister; it may simply result from the child's retention by one parent." *Aguilera v. De Lara*, 2014 WL 3427548 (D. Ariz. 2014) (citing *Hirst v. Tieberghien*, 947 F. Supp. 2d 578, 598 (D.S.C. 2013); *Haimdas*, 720 F. Supp. 2d at 204).

The discretionary aspect of the Hague Convention exceptions ". . . is particularly important with respect to the mature child exception because of the potential for undue influence by the person who allegedly wrongfully retained the child." *Haimdas*, 720 F. Supp. 2d at 204 (quoting *Hazbun Escaf v. Rodriguez*, 200 F. Supp. 2d 603 (E.D. Va. 2002) (returning a 13-year-old child to Colombia after finding that the child at age 13 was not sufficiently mature and was susceptible to suggestion and manipulation)); *see also Velozny*, 550 F. Supp. 3d 4, 26 (S.D.N.Y. 2021); *see also* § IV(B)(2) *infra*.

To the extent the child may express any objection to return, it should be accorded little if any weight and viewed in the context of what this child has endured. The child was removed from England by the Mother approximately eight months ago. He has been with the Mother ever since, and has been subjected to the undue influence of the Mother, and interviewed by the Mother's counsel.

### 2.      The Mother's Proposed Expert Testimony Will Not Meet Rule 702 Standards.

The Mother has designated child psychologist Dr. Bennett Pologe to testify in support of her position on the older child's alleged maturity and alleged objection to returning to England. The Court should disregard the Mother's proposed expert testimony, and either decline to qualify Dr. Pologe as an expert or give his testimony little, if any, weight.

Dr. Pologe's opinion is based on one interview of the Mother and one interview of the child the next day. Upon information and belief, he has never evaluated the Mother or the children. Dr. Pologe has never met with, interviewed, or evaluated any of the RBKC or predecessor WCC social workers. He has never requested to do so. Upon information and belief, Dr. Pologe has never interviewed any collateral sources relating to the children (*e.g.,* either child's father, the older child's teachers, either of the alleged domestic violence perpetrators, any friends or relatives, police, health care workers, and others involved in England in safeguarding the children). Instead, upon information and belief, Dr. Pologe's testimony will recite the conversation he had with the older child and then will, upon information and belief, attempt to opine on the child's credibility or maturity or objection. His opinions and methodologies do not meet Federal Rule of Evidence 702 and *Daubert* standards, and are non-compliant with his own profession's guidelines.[5]

Although Dr. Pologe has the educational and licensing credentials that may otherwise be sufficient to qualify him as an expert, his testimony does not meet the Federal Rule of Evidence 702 requirements. The Mother will not be able to demonstrate that Dr. Pologe has scientific, technical, or other specialized knowledge that will help the Court to understand the evidence or to determine a fact in issue. Fed. R. Evid. 702(a). Dr. **Pologe**'s proposed testimony is not based on sufficient facts or data. *Id*. at 702(b). His testimony is not the product of reliable principles and

---

[5] *See, e.g.,* American Psychological Association Specialty Guidelines for Forensic Psychology, Guideline 9.03 (Opinions Regarding Persons Not Examined: "Forensic practitioners recognize their obligations to only provide written or oral evidence about the psychological characteristics of particular individuals when they have sufficient information or data to form an adequate foundation for those opinions or to substantiate their findings (EPPCC Standard 9.01). Forensic practitioners seek to make reasonable efforts to obtain such information or data, and they document their efforts to obtain it. When it is not possible or feasible to examine individuals about whom they are offering an opinion, forensic practitioners strive to make clear the impact of such limitations on the reliability and validity of their professional products, opinions, or testimony."), text available at: https://www.apa.org/practice/guidelines/forensic-psychology (last visited January 5, 2022).

methods. *Id*. at 702(c). He has not reliably applied any such principles or methods to this case. *Id*. at 702(d).

Dr. Pologe's opinions and the methodologies employed to reach his opinions, do not meet the *Daubert* standard and he should not be qualified as an expert in any field in this case. *See Daubert v. Merrell Dow Pharmaceuticals Inc*., 509 U.S. 579 (1993); Fed. R. Evid. 702. Alternatively, his opinions should be afforded no weight. *See Jacquety v. Baptista*, 538 F. Supp. 3d 325, 338 (S.D.N.Y. 2021) (criticisms of an expert's methodology were explored on cross-examination and went to the weight of the testimony) (citations omitted).

      **3.**      **The evidence to be adduced will demonstrate undue influence.**

RBKC has designated two social workers—Nicola Shanks (RBKC Social Worker) and Jenny Bastock (WCC Social Worker, RBKC's predecessor)—under FRCP 26(a)(2)(C) as non-retained and not specially employed experts. Both are qualified social workers who have specialized knowledge of the Bafna-Louis family and children. Both have been the social workers assigned to the family and have personally observed the children and family and have intervened as Social Workers to help the family. They have both participated in the English High Court's proceedings involving the children. They both have specialized knowledge of the social work interventions for the family, have applied reliable social work principles and methods for the care of the family, and have personally observed and/or been made aware of events relating to the family and children.

The evidence to be adduced at trial through the two social workers includes, *inter alia*, their acute concern for the children's circumstances due to the actions of the children's caregivers, the children being forced to live in secret, and the Mother's alcoholism. Their evidence includes the social workers' opinions on the Mother's undue influence on CB-L. And it includes their

opinions that can be summarized as CB-L not being sufficiently mature and not competent to object to return to England, particularly in light of his domestic violence and abduction experiences. He has assumed a caretaker role for the Mother that is not healthy and which skews his views even though he has been assaulted by the Mother. The evidence to be adduced at trial will not establish that the older child's objections, if any, should be taken into account.

**B.     Article 13*b* Grave Risk & Intolerable Situation.**

**1.     Grave Risk.**

The Mother asserts as a part of her "First Affirmative Defense" that she has been subjected to domestic violence in England by two men, and that the children have been affected by the alleged domestic violence. RBKC therefore addresses the Convention's article 13*b* "grave risk" exception here, to the extent the Mother is asserting the exception through her domestic violence allegations involving third party actors. The Mother has the burden to prove the grave risk exception by clear and convincing evidence. ICARA § 9001(a)(4). The clear and convincing evidence standard in the Second Circuit means "something more than a preponderance of the evidence and something less than beyond reasonable doubt." *U.S. v. Chimurenga*, 760 F.2d 400, 405 (2d Cir. 1985) (citing *Addington v. Texas*, 441 U.S. 418, 431 (1979)). The grave risk exception "is to be interpreted narrowly lest it swallow the rule." *Jacquety*, 538 F. Supp. 3d at 333.

There is a high bar required in the Second Circuit for a respondent to meet its burden on the grave risk exception:

> A grave risk of harm from repatriation arises . . . in cases of serious abuse or neglect, or extraordinary emotional dependence, when the court in the country of habitual residence, for whatever reason, may be incapable or unwilling to give the child adequate protection. The potential harm to the child must be severe, and the. . . . level of risk and danger required to trigger this exception has consistently been held to be very high. The grave risk involves not only the magnitude of the potential harm, but also the probability that it will materialize.

*Id.* (quoting *Souratgar v. Lee*, 720 F.3d 96, 103 (2d Cir. 2013)); *see also Ermini*, 758 F.3d at 164

The Fourth Circuit takes a similar approach to the Second Circuit and explains the approach

to analyzing grave risk as follows:

> In thinking about these problems, we acknowledge that courts in the
> abducted-from country are as ready and able as we are to protect
> children. If return to a country, or to the custody of a parent in that
> country, is dangerous, we can expect that country's courts to
> respond accordingly . . . When we trust the court system in the
> abducted-from country, the vast majority of claims of harm – those
> that do not rise to the level of gravity required by the Convention –
> evaporate.

*Miller v. Miller*, 240 F.3d 392, 402 (4th Cir. 2001) (quoting *Friedrich v. Friedrich*, 78 F.3d 1060

(6th Cir. 1996)).

Here, the abducted-from country is England. The evidence to be adduced at trial will not

establish that there a grave risk in returning the children to England. RBKC has been involved with

the family in England for nearly 13 years. It has a child protection plan in place for both children.

The Mother, RBKC and the younger child's father are fully involved in care, wardship, and child

arrangements litigation regarding the children in the court system in England. The English High

Court has ordered the Mother to return the children to England. The English High Court has

appointed a guardian for the children in England. And CB-L has his own solicitor in England.

The evidence to be adduced at trial will demonstrate that the English court system and its

agencies, including RBKC, are ready, willing, and able to continue to protect the children at issue

here and to make appropriate child custody determinations in the children's best interests. And

they have been engaged in doing so already. The United States and English court systems trust one

another to do so.

In RBKC's submission, the Mother cannot prove by any evidentiary standard—certainly not by the clear and convincing evidence standard—that the children will be subjected to any risk of harm upon return to England. There is no grave risk in returning the children to England. RBKC's Petition for Return should be granted and the children returned to England forthwith.

## 2.    Intolerable Situation.

The Mother also asserts the second prong of the Article 13*b* exception—intolerable situation—claiming (A) that it is possible that only the younger child would be returned to England in the event the older child's objection is accepted by the Court; or (B) the Mother and/or children may not be able to enter the UK under UK immigration law and would be detained upon attempted entry. The Mother also has the burden to prove intolerable situation by clear and convincing evidence. ICARA § 9001(a)(4). Neither the evidence to be adduced at trial, nor UK Immigration law, nor American Hague Convention jurisprudence support the Mother's position.

Firstly, although separating siblings may not be a desirable arrangement, American Hague Convention jurisprudence does not consider returning one child in a sibling group to the requesting State without the others to be a grave risk or intolerable situation. *See, e.g., Asumadu v. Baffoe*, 2018 WL 3957696 (D. Ariz. 2018) (returning the older child to Canada and declining to return the younger child because habitual residence had only been establish for the older child), *aff'd* 765 Fed. Appx. 200 (9th Cir. 2019).[6]

---

[6] In one district court case in Iowa, after holding that the petitioner had not proved his *prima facie* case by a preponderance of the evidence, the court explained in *dicta* that it would have found there was a grave risk in returning one of the siblings to Turkey because that sibling required a kidney transplant which was to be completed in the United States. *Leonard v. Lentz*, 297 F. Supp. 3d 874, 890-901 (N.D. Iowa 2017). Based on the grave risk findings as to one sibling, the district court would have declined to return all three children. *Id*. But none of the children in that case would have been returned anyway because the petitioner did not prove his *prima facie* case for return. *Id*.

Even if this Court were to accept that the older child is sufficiently mature and that he has particularized objections not based on undue influence, and find that the child's objection discretionary exception as to CB-L had been established despite the English Court's numerous return orders—which it should not—American jurisprudence does not support the Mother's position that neither child should therefore be returned.

Instead, this Court's own approach in that circumstance is to use its discretion to *return both* children. *Velozny v. Velozny*, 550 F. Supp. 3d 4, 26 (S.D.N.Y. 2021). In *Velozny*, the children at issue were ages 15, 12, and 4. *Id*. at 11. The respondent asserted the mature child's objection exception as to the two older children. *Id*. at 22-26. The Court held that assuming, arguendo, that the two older children had reached an age and degree of maturity at which it would have been appropriate for the court to take account of their views, only the middle child's statement "came close to stating an objection." *Id*. The Court therefore held that the exception had not been established. But it explained that even if it had found that the middle child's statement were to be considered an objection, the Court ". . . would still exercise its discretion to order the return of all three children" rather than return the older and youngest, but not the middle child. *Id*. The Court elaborated that it was "undesirable" to put the middle child in the position of "deciding the geographic fate" of the entire sibling group. *Id*. It was undesirable to separate a sibling group. *Id*. In those circumstances, which are present here, the Convention provides a mechanism—by categorizing all of the exceptions to return as discretionary—for courts to resolve any potential sibling separation issues. The resolution is for courts to exercise discretion to return all siblings in a sibling group even when the child's objections exception is established for one of the siblings.

Secondly, the evidence to be adduced at trial will not establish any immigration-based impediment to the Mother and children to enter the UK in accordance with any return order entered

by this Court and in accordance with the English High Court's orders. RBKC has filed a Declaration, as ordered by this Court, executed by Phil Haywood, specialist immigration barrister licensed in England, to rebut the Mother's claims that she and/or the children cannot enter England and would be detained upon attempting to do so. Mr. Haywood's Rule 44.1 Declaration[7] sets forth the avenues through which the Mother and each child may enter the UK assuming this Court orders the children returned. (Doc. No. 36-1). RBKC incorporates by reference herein Mr. Haywood's Declaration. The children will not be placed in an intolerable situation if returned to England.

### 3.    Ameliorative Measures Will Ensure the Children's Safe Return.

Even if the this Court were to make a finding of grave risk or intolerable situation—a standard the Mother cannot meet—the Court still has the discretion to return the children to England. *Golan v. Saada*, 142 S. Ct. 1880, 1887 (2022). The "discretion to determine whether to return a child where doing so would pose a grave risk to the child includes the discretion whether to consider ameliorative measures that could ensure the child's safe return." *Id*. at 1893. But that "discretion is not a whim." *Id*. (quotation omitted). Courts considering Hague Convention cases ". . . ordinarily should address ameliorative measures raised by the parties or obviously suggested by the circumstances of the case . . ." *Id*.

The Supreme Court has provided guidance to lower courts on the consideration of ameliorative measures. *Id*. at 1893-94. Firstly, consideration of ameliorative measures must prioritize the children's physical and psychological safety. *Id*. Secondly, consideration of ameliorative measures must not usurp the role of the court that will adjudicate the underlying custody dispute. *Id*. Thirdly, consideration of ameliorative measures must accord with the Convention's requirement that courts act expeditiously in Hague Convention proceedings. *Id*.

---

[7] *See* § III(C) at p. 11 *supra*.

In the event the Mother were to meet her very high clear and convincing burden, which RBKC submits she cannot meet under American Hague jurisprudence, the RBKC submits it would then be appropriate to order a return with ameliorative measures, particularly because the English judicial and social support systems are already fully involved with this family. They are able to provide any necessary services and the English High Court has already ordered the children's return.

The appropriate ameliorative measures in the event of a grave risk and intolerable situation finding, pending any further orders made by the English High Court upon the children's return are: (1) the Mother shall have the opportunity to return to England by a date-certain set by this Court before alternative return travel arrangements are made; and (2) RBKC and the Mother shall comply with all existing English High Court orders unless and until the English High Court orders otherwise; (3) RBKC shall continue to provide services to the family under its child protection plan unless and until the English High Court orders otherwise; and (4) to the extent any UK Immigration approvals are required for either the Mother or children to enter England, the Mother shall cooperate fully with UK immigration officials to obtain any such approvals. The proposed ameliorative measures ensure the children's safe return to England, without usurping the role of the English courts, and in the expeditious manner required by the treaty. *See Golan*, 142 S. Ct. at 1895.

### C.     Unclean Hands Does Not Apply to Hague Convention Cases.

RBKC's claim is not barred by the doctrine of unclean hands as the Mother wrongly asserts. RBKC has not behaved in any inequitable manner with respect to either child living in England. Even if RBKC had engaged in inequitable behavior that would ordinarily trigger an unclean hands

bar to relief, the doctrine does not apply in Hague Convention cases. *Karpenko v. Leendertz*, 619 F.3d 259, 265-66 (3rd Cir. 2010).

The Third Circuit has explained that the purpose of the Hague Convention is to protect the well-being of children from the harms caused by wrongful removal. *Id*. at 265. Conduct of the parents is not mentioned in the treaty, other than to the extent it is relevant to the *prima facie* elements and the exceptions to return. *Id*. The entire purpose of the treaty is to "discourage kidnapping in connection with custody disputes." *Id*.

The *Karpenko* Court therefore concluded "that the application of the unclean hands doctrine would undermine the Hague Convention's goal of protecting the well-being of the child, of restoring the status quo before the child's abduction, and of ensuring that rights of custody and of access under the law of one Contracting State are effectively respected in the other Contracting States." *Id*. (internal quotations omitted). The *Karpenko* Court reasoned that "if relief for abduction were unavailable to parents with allegedly unclean hands, the well-being of the abducted child, which is a main purpose of the Hague Convention, would be ignored. There would be no remedy to prevent a cycle of abduction and re-abduction, an outcome which would inflict needless harm on vulnerable children." *Id*. at 266.

## V.     Potential Evidentiary Issues.

### A.     Article 30 Admissible Documents.

RBKC will designate certain proposed exhibits in its Evidentiary Hearing Exhibit List that have been submitted to the English and American Central Authorities as attachments or supplemental attachments to its Hague Convention Application. Article 30 of the Hague Convention provides that:

> [a]ny application submitted to the Central Authorities or directly to
> the judicial or administrative authorities of a Contracting State in
> accordance with the terms of the Convention, along with documents
> and other information appended thereto or provided by a Central
> Authority, shall be admissible in the courts or other administrative
> authorities of the Contracting States.

Convention, art. 30.

ICARA further provides that no authentication of any such documents moved into evidence by the Father is required.  ICARA § 9005; *see also Ngassa v. Mpafe*, 488 F. Supp. 2d 514, 518, n.3 (D. Md. 2007).

**B.     Federal Rule of Civil Procedure 26(a)(2)(C).**

RBKC has designated two social workers—Nicola Shanks (RBKC Social Worker) and Jenny Bastock (WCC Social Worker, RBKC's predecessor)—under FRCP 26(a)(2)(C) as non-retained and not specially employed experts. RBKC timely produced its disclosure of Ms. Shanks and Ms. Bastock to the Mother's counsel and to the court-appointed counsel for the children, which includes all required elements of the Rule.

**VI.     CONCLUSION**

The children's habitual residence is England. The English judicial, social welfare and English support systems and services, including the English High Court and RBKC, are actively involved with this family and have a well-developed plan for their return. They are ready, willing and able to protect the children and to facilitate the English High Court proceedings going forward forthwith. None of the discretionary defenses apply. The children should be returned forthwith to England.

<div style="margin-left:50%">

/s/ Joel L. Perrell
Joel L. Perrell, Bar No. JP1376
Miles & Stockbridge P.C.
100 Light Street
10th Floor

</div>

Baltimore, MD 21202
(410) 385-3762
(410) 385-3700 (fax)
jperrell@milesstockbridge.com


/s/ Kelly A. Powers
Stephen J. Cullen, *Pro Hac Vice*
Kelly A. Powers, *Pro Hac Vice*
Miles & Stockbridge P.C.
1201 Pennsylvania Avenue, N.W.
Suite 900
Washington, D.C. 20004
(202) 465-8374
(410) 385-3709 (fax)
scullen@milesstockbridge.com
kpowers@milesstockbridge.com

*Attorneys for Petitioner*


## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 5th day of January, 2023, a copy of the foregoing Petitioner's Pretrial Brief was electronically filed, and that it is available for viewing and downloading from the ECF system to all counsel of record.


/s/   Kelly A. Powers
Kelly A. Powers, *Pro Hac Vice*