UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
ROYAL BOROUGH OF KENSINGTON AND
CHELSEA,

                    Petitioner,                              22-cv-8303 (PKC)

        -against-
                                                     OPINION, FINDINGS OF FACT,
                                                        CONCLUSIONS OF LAW,
                                                            <u>AND ORDER</u>

TARA BAFNA-LOUIS, also known as TALIA
BECKER, TALIA LOUIS, TARA BECKER,
TARA BAYNARD, TALIYA BECKER and/or
TALIYA LOUIS,

                    Respondent.
-----------------------------------------------------------x

CASTEL, U.S.D.J.

            The Royal Borough of Kensington and Chelsea (the "RBKC") brings this petition

for the return of CBL and Baby L to the United Kingdom pursuant to the Hague Convention on

the Civil Aspects of International Child Abduction (the "Convention" or "Hague Convention"),

and the International Child Abduction Remedies Act, 22 U.S.C. § 9001 ("ICARA").  The RBKC

is a local government authority within Greater London.  At the time of CBL's removal, the

RBKC was both responsible for the administration of the child-protection plan and was the

applicant in CBL's Wardship Proceeding before the High Court of England and Wales (the

"High Court").  Under United Kingdom law, the RBKC also is delegated the authority to enforce

the rights of the High Court relating to CBL and Baby L.

            Respondent Tara Bafna-Louis, the mother of CBL and Baby L, is a citizen of the

United States and Hungary who has long resided in London.  She currently resides in Manhattan

with CBL, age thirteen, and Baby L, age 16 months.

As with many proceedings under the Hague Convention on Child Abduction, this case touches on painful matters that include rape, harassment and substance abuse.  But this Court's role under the Hague Convention is narrow.  This Court must decide whether the RBKC has proven by a preponderance of the evidence that the removal of the children from the United Kingdom breached rights of custody that were being exercised by the RBKC or the High Court in the children's country of habitual residence at the time of their removal.  The Court may decline to order a child's return if Bafna-Louis proves by clear and convincing evidence a defense under the Convention.  The Court may also decline to order a return of a child based on the child's preference if he is of an age and has the maturity that his views should be taken into account.

For reasons that will be explained, the Court finds that the RBKC has proven its entitlement to relief under the Hague Convention.  It also finds that Bafna-Louis has not demonstrated by clear and convincing evidence that Baby L is at grave risk of physical or psychological harm or otherwise will be placed in an intolerable situation if returned to the United Kingdom.  The Court further finds on the basis of an in camera interview of the thirteen-year-old CBL that it is appropriate under Article 13 of the Convention to defer to CBL's preference not to be ordered to return to the United Kingdom.  CBL is mature and insightful, and he thoughtfully explained the reasons he wishes to remain in the United States to pursue his high-school education.  He also expressed deep affection for his mother and younger brother, and stated that he would accompany them to London if Baby L's return is ordered.  In light of CBL's age and degree of maturity, the Court will defer to his thoughtful preference and decline to order his return.

I.       Overview of the Hague Convention.

        The Hague Convention seeks "'to secure the prompt return of children wrongfully

removed to or retained in any Contracting State,' and 'to ensure that rights of custody and of

access under the law of one Contracting State are effectively respected in the other Contracting

States.'" Abbott v. Abbott, 560 U.S. 1, 8 (2010) (quoting Hague Convention Art. 1, at 51 Fed.

Reg. 10494-01).  The United States is a contracting party to the Convention, which Congress

implemented through ICARA, 22 U.S.C. § 9001, et seq.[1]  See Abbott, 560 U.S. at 5.

        "[T]he Convention's central operating feature is the return of the child.  That

remedy, in effect, lays venue for the ultimate custody determination in the child's country of

habitual residence rather than the country to which the child is abducted." Lozano v. Montoya

Alvarez, 572 U.S. 1, 5 (2014) (citation and quotation marks omitted); accord Abbott, 560 U.S. at

20 ("The Convention is based on the principle that the best interests of the child are well served

when decisions regarding custody rights are made in the country of habitual residence.").  "The

Convention's drafters were particularly concerned by the practice in which a family member

would remove a child to jurisdictions more favorable to his or her custody claims in order to

obtain a right of custody from the authorities of the country to which the child had been taken."

Mota v. Castillo, 692 F.3d 108, 112 (2d Cir. 2012) (quotation marks omitted).  "The decision

concerning repatriation shall not be taken to be a determination on the merits of any custody

issue." Souratgar v. Lee, 720 F.3d 96, 102 (2d Cir. 2013) (quotation marks omitted).  "Upon the

child's return, the custody adjudication will proceed in that forum." Monasky v. Taglieri, 140 S.

Ct. 719, 723 (2020).

---

[1] Effective August 8, 2014, the text of ICARA was reorganized within the United States Code to 22 U.S.C. § 9001, from 42 U.S.C. § 11601.  ICARA's substantive provisions were not amended.

"Any person seeking to initiate judicial proceedings under the Convention for the return of a child . . . may do so by commencing a civil action by filing a petition for the relief sought . . . ." 22 U.S.C. § 9003(b).  ICARA defines "person" to include "any . . . institution, or other legal entity or body . . . ."  Id. § 9002(5).  To prevail, the petitioner must establish by a preponderance of the evidence that "the child has been wrongfully removed or retained within the meaning of the Convention . . . ."  Id. § 9003(e)(1)(A).  ICARA permits a court to consider a wide universe of documents without authentication.  Id. § 9005.

Article 3 of the Convention defines a wrongful removal as follows:

The removal or the retention of a child is to be considered wrongful where –

a)   it is in breach of rights of custody attributed to a person, an institution or any other body, either jointly or alone, under the law of the State in which the child was habitually resident immediately before the removal or retention; and

b)   at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention.

The rights of custody mentioned in sub-paragraph a) above, may arise in particular by operation of law or by reason of a judicial or administrative decision, or by reason of an agreement having legal effect under the law of that State.

"Thus, a petitioner under the Hague Convention must demonstrate by a preponderance of the evidence that '(1) the child was habitually resident in one State and has been removed to or retained in a different State; (2) the removal or retention was in breach of the petitioner's custody rights under the law of the State of habitual residence; and (3) the petitioner was exercising those rights at the time of the removal or retention.'"  Hofmann v. Sender, 716 F.3d 282, 291 (2d Cir. 2013) (quoting Gitter v. Gitter, 396 F.3d 124, 130-31 (2d Cir. 2005)).

Article 13 of the Convention establishes defenses available to a respondent who opposes a child's return.  It states in relevant part that:

> [T]he judicial or administrative authority of the requested State is not bound to order the return of the child if the person, institution or other body which opposes its return establishes that –
>
> a)  the person, institution or other body having the care of the person of the child was not actually exercising the custody rights at the time of removal or retention, or had consented to or subsequently acquiesced in the removal or retention; or
> b)  there is a grave risk that his or her return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation.
>
> The judicial or administrative authority may also refuse to order the return of the child if it finds that the child objects to being returned and has attained an age and degree of maturity at which it is appropriate to take account of its views.

ICARA provides that a respondent must prove an Article 13(b) defense by clear and convincing evidence, and that "any other exception" set forth in Article 13 must be proven by a preponderance of the evidence.  22 U.S.C. § 9003(e)(2).  "By providing that a court 'is not bound' to order return upon making a grave-risk finding, Article 13(b) lifts the Convention's return requirement, leaving a court with the discretion to grant or deny return."  Golan v. Saada, 142 S. Ct. 1880, 1892 (2022).

II.      The RBKC Has Standing under the Convention and ICARA.

Early in this proceeding, the Court raised sua sponte the issue of RBKC's standing under the Hague Convention to petition for the return of CBL and Baby L.[2]  (ECF 21.) The Court concludes that, as a threshold matter, the RBKC has standing under Article 8 of the Convention, which states in part that "[a]ny . . . institution or other body claiming that a child has

---

[2] The parties' written submissions generally refer to Baby L as LCJB, though at the hearing he was identified as Baby L.  For the sake of simplicity, the Court refers to him as Baby L.

been removed or retained in breach of custody rights may apply . . . to the Central Authority of any other Contracting State for assistance in securing the return of the child." See also Article 3(a) (contemplating that a child may have been removed "in breach of rights of custody attributed to . . . an institution or any other body, either jointly or alone, under the law of the State in which the child was habitually resident . . . ."). In implementing the Convention, ICARA sets forth conditions for "[a]ny person" to file a petition for relief, and defines person to include "any . . . institution, or other legal entity or body . . . ." 22 U.S.C. §§ 9003(b), 9002(5).

The text of both the Convention and ICARA therefore recognize that an institution or other body may apply for the return of a child, and that such an entity may have rights of custody. The RBKC's entitlement to relief turns on whether it has satisfied its burden under the Hague Convention and ICARA, but there is no threshold obstacle to a local governmental authority proceeding under the Convention.

III.   Findings of Fact.

A.   Overview of the Proceedings.

The Court sets forth its findings of fact, mindful that much of the Hague Convention analysis implicates mixed questions of fact and law.[3] See, e.g., Monasky v. Taglieri, 140 S. Ct. 719, 730 (2020). It separately sets forth its conclusions of law.

The Court held a hearing on the Petition on January 23, 24 and 25, 2023. Two witnesses testified by remote video transmission: Jenny Bastock, a social worker for the City of Westminster, and Nicola Shanks, a social worker for the RBKC.[4] Bafna-Louis testified in Court, as did Jim Moody, a longtime friend of Bafna-Louis described as the godfather of CBL and Baby

---

[3] The citation of evidence is illustrative and is not intended to mean that the cited evidence is the only evidence that supports a finding.
[4] The Court made the required findings under Rule 43(a), Fed. R. Civ. P., in a written Order prior to the hearing. (ECF 30.)

L.  The Court received into evidence attorney affidavits from Simon Craddock on the United Kingdom and attorney affidavits from Phil Haywood on the immigration laws of the United Kingdom, all of which were offered by the RBKC.  Post-hearing briefs have been filed on behalf of Bafna-Louis, the RBKC and CBL, and the RBKC has also submitted proposed findings of fact and conclusions of law.  (ECF 80-82, 86.)

In advance of the hearing, the Court appointed the law firm of Davis Polk & Wardwell LLP to represent CBL pro bono publico, and his attorneys were present throughout the hearing.  (ECF 33.)  The Court conducted an in camera interview of CBL on February 2, 2023.  Two of CBL's attorneys were present, but neither Bafna-Louis nor any attorneys or representatives of the parties was present.[5]  The interview lasted approximately two hours and fifteen minutes.

B.  Overview of the Parties.

Bafna-Louis is a citizen of the United States and Hungary.[6]  (Tr. 145.)  She grew up in New York City.  (Tr. 241)  After graduating from Georgetown University, she attended graduate school at Oxford University in England and has remained in England for much of her adult life.  (Tr. 139.)  Bafna-Louis testified that she has made a living principally through independent work as a consultant in the financial services industry.  (Tr. 409-11.)

Bafna-Louis gave birth to CBL in France in September 2009.  (Tr. 140.)  CBL's biological father is a Russian national who maintains no contact with CBL and has communicated that he wishes to have no role in CBL's upbringing.  (Tr. 311; RX 52.)  CBL is a citizen of the United States and Hungary.  (Tr. 140.)  When CBL was a young child, he and

---

[5] No party requested to be present.
[6] Tara Bafna-Louis currently prefers to go by the name first name of Talia and the last name of Individual-3, and has legally changed her name in the United Kingdom but not in the United States.  (Tr. 144-45.)  Consistent with the name used in the Petition and other filings, the Court identifies her as Tara Bafna-Louis.

Bafna-Louis relocated to New York City from approximately 2010 to 2013 or 2014, at which point they returned to London.  (RX 52 ¶ 14.)  CBL attended a private school in London that was an approximately eight-minute walk from the family home in the Belgravia neighborhood.  (Tr. 319.)  CBL thrived academically and socially in London, participated in a wide range of athletic and extra-curricular activities, and was well liked by peers and teachers.  (Tr. 320-21; PX 5 at RBKC001228; RX 52.)

Bafna-Louis gave birth to Baby L in London in October 2021.  (Tr. 140-41, 322.)  Baby L is a citizen of the United States and the United Kingdom, but Bafna-Louis testified that she is in the process of renouncing Baby L's citizenship of the United Kingdom.  (Tr. 141.)  Though it now seems to be understood that Individual-1 is the biological father of Baby L, his paternity has been disputed, and, as will be discussed, Individual-1's parental rights are the subject of ongoing court proceedings in London.

Shortly after Baby L's birth, Bafna-Louis and the two boys came to the attention of social-services authorities in the City of Westminster.  On the night of November 15, 2021, Bafna-Louis called law enforcement to report that Individual-2 was outside of her home.  (PX 4; PX 5 at RBKC 001219; Tr. 232.)  When police arrived, they observed that Bafna-Louis spoke with slurred speech and appeared disoriented, and that she was holding Baby L in a precarious position.  (PX 4.)  Bafna-Louis then dropped Baby L onto the wooden floor.  (PX 4; Tr. 232-33.)  Bafna-Louis and Baby L were taken by ambulance to Chelsea in Westminster Hospital and released.  (Tr. 19; PX 4.)

The City of Westminster is a department of local government within Greater London, and the parties often refer to the City of Westminster and the RBKC as a "local authority."  On or about January 6, 2022, a social work team for the City of Westminster held a

child protection conference that led to the implementation of a Child Protection Plan for CBL and Baby L.  (PX 5.)  At the time, Baby L was approximately two months old and CBL was twelve years old.  (Id.)  Fourteen people attended the conference, including Bafna-Louis, social workers and the head teacher of CBL's school.  (Id.)  The Westminster authorities were primarily worried about Bafna-Louis's use of alcohol and how it might affect the two boys.  (Id.) The City of Westminster adopted a plan whereby a social worker would make a home visit at least every ten days to "see and speak to the child."  (Id.)  The City of Westminster would also provide alcohol-treatment services to Bafna-Louis.  (Id.)

As will be discussed, in April 2022, Bafna-Louis and CBL relocated within London, from the Belgravia neighborhood under the jurisdiction of the City of Westminster to the Bina Gardens neighborhood under the jurisdiction of the RBKC.

C.  Individual-1.

To understand the turbulent circumstances preceding the removal of Baby L and CBL, as well as the Article 13(b) defense asserted by Bafna-Louis under the Hague Convention, it is important to review Bafna-Louis's testimony about the actions of three non-parties who will be referred to as Individual-1, Individual-2 and Individual-3.[7]

Bafna-Louis met Individual-1 in or around 2019 through Individual-1's sister, an amateur soccer player who gave private soccer lessons to CBL.  (PX 27 ¶ 6; Tr. 199, 321.)  The exact nature of their relationship is not clear.  Bafna-Louis once told a City of Westminster social worker that she had been in a four-year relationship with Individual-1, then later denied that they

---

[7] For the purposes of Bafna-Louis's Article 13(b) defense, the Court assumes the truth of her accounts about the actions of Individual-1 and Individual-2 and concludes that with this generous assumption, the evidence does not satisfy the standard under Article 13(b) and ICARA to establish a grave risk of physical or psychological harm to Baby L or an otherwise intolerable circumstance for him.  Individual-1, Individual-2 and Individual-3 were not called as witnesses.

had been in a relationship.  (PX 5 at RBKC001225.)  In a submission to the Central Family Court in London (the "Family Court"), Bafna-Louis characterized Individual-1 as a "sperm donor" in her efforts to conceive a second child.  (PX 27 ¶ 6.)  At the hearing, Bafna-Louis described their relationship as "a neutral sort of good relationship.  I would say a friendly relationship for a period of time."  (Tr. 203.)  Bafna-Louis testified that "he would help us to collect like at the gas station the large packages of water, things like that."  (Tr. 199.)  Bafna-Louis sometimes saw Individual-1 daily and sometimes weeks passed without interaction.  (Tr. 199.)  Individual-1 acted as a cat sitter and kept a spare key to the family home.  (Tr. 191, 395.)

> For a time, CBL and Individual-1 had a friendly rapport, and exchanged text messages.  (PX 18; Tr. 203.)  During a period when Bafna-Louis abused alcohol and prescription pills, CBL texted Individual-1 for advice and emotional support, and he provided an adult source of stability for CBL.  (PX 18.)

> Beginning in late 2020, Individual-1's behavior toward Bafna-Louis turned hostile, for reasons that she says are unclear.  (Tr. 190-91, 203.)  Bafna-Louis described occasions where Individual-1 menaced and attacked her.  He once held his thumbs to her collarbone and restrained her movement for about 30 seconds.  (Tr. 191.)  In another incident, he arrived unannounced while intoxicated and entered the home using his spare key.  (Tr. 191.)  He ignored Bafna-Louis's instructions to leave, then pushed a broken metal can into her forehead, leaving a bloody cut.  (Tr. 191-92; RX 33.)  Bafna-Louis received treatment at a hospital but did not inform law enforcement because she feared both violent reprisals and also that Individual-1 would publish an intimate video of her that he filmed without consent.  (Tr. 193, 199-200.)  Bafna-Louis also testified that Individual-1 pushed her against a wall "a handful of times" and

that "there were none that were as violent as the cut." (Tr. 195.) Bafna-Louis remains concerned about Individual-1's "ongoing threat" to post the intimate video. (Tr. 197-98, 202.)

Bafna-Louis testified that Individual-1 raped her on or about February 14, 2021. (Tr. 195.) She testified that Individual-1 arrived to her home and that she felt unwell after drinking a juice that he served her. (Tr. 195-96.) She has no memory of what then transpired, but found indicia of "[n]on-consensual sex that could have led to pregnancy." (Tr. 195-96.) Bafna-Louis did not report the rape to police but instead informed the Westminster local authority. (Tr. 196-97.) She also stated, "I had reported to the police not specifics, like without a name." (Tr. 199.)

On or about December 15, 2021, Individual-1 commenced paternity proceedings against Bafna-Louis in the Family Court, asserting that he is the biological father of Baby L. (RX 6; PX 11.) Individual-1 made an ex parte application to the Family Court for a prohibited-steps order barring Bafna-Louis from removing Baby L from England and Wales. (RX 6.) Individual-1 claimed that Bafna-Louis had stated her intention to permanently remove Baby L to the United States on December 17, 2021, and that he did not consent to such removal. (Id.) As summarized by the Family Court, Individual-1 "seeks to play an active role in the upbringing of the child," and the Family Court's order stated, "Parentage of the father is not disputed apparently after a DNA test recently. He asserted the mother refused to place his name on the birth certificate." (Id.)

The Family Court granted Individual-1's ex parte application for a prohibited-steps order, stating that "the court wants to ensure the child remains within the jurisdiction for appropriate orders to be made in the best interest of the child . . . ." (RX 6.) On the next day, December 16, 2021, the Family Court renewed the prohibited-steps order, after Bafna-Louis had

the opportunity to be heard.  (PX 11.)  In an Order of March 10, 2022, the Family Court again

stated, "The mother must not remove the child from the jurisdiction of England and Wales until

further order."  (Id.)  In boldfaced, underlined text, that Order also stated, "To Tara Bafna Louis:

If you the within-named respondent do not comply with this order you may be held to be in

contempt of court and imprisoned or fined, or your assets may be seized."  (Id.)  It separately

stated, in boldfaced text, "It may be a criminal offence under the Child Abduction Act of 1984 to

remove the child from the United Kingdom without leave of the court."  (Id.)

     D.  <u>Individual-2.</u>

Bafna-Louis also testified that Individual-2 raped her, and described Individual-

2's prolonged harassment campaign against her and CBL after she reported to local police that

she was raped by Individual-2.

Bafna-Louis met Individual-2 at a dinner party in December 2020 and they stayed

in touch afterward.  (Tr. 177.)  Bafna-Louis asserts that she was "not in an intimate relationship"

with Individual-2.  (Tr. 189.)  She testified that they interacted in person for a total of five or six

times, including a February 2021 visit to her home, when he cooked a meal and played chess.

(Tr. 177, 180-81.)

Bafna-Louis testified that Individual-2 raped her on April 1, 2021.  (Tr. 177.)  She

stated that she drank two or three glasses of white wine, and then blacked out as a result of her

difficulty metabolizing alcohol.  (Tr. 177-78.)  When she returned to consciousness, she felt pain,

and observed indicia of intercourse.  (Tr. 178.)  As described by Bafna-Louis, Individual-2's

subsequent messages identified their encounter as rape:  "I can't really describe how it came

about.  In fact, I didn't even know that it had occurred until [Individual-2] sent pages and pages

of WhatsApp messages describing exactly what had happened on that evening."  (Tr. 177.)  She

testified that she privately accused Individual-2 of rape, and that Individual-2 then contacted law enforcement and asserted that Bafna-Louis was blackmailing him. (Tr. 178.) Bafna-Louis testified that after she spoke to police, Individual-2 was arrested but not charged, and she described a positive interaction with law enforcement at that time. (Tr. 179.)

At the hearing, Bafna-Louis called as a witness James Moody, a longtime family friend and the godfather of CBL and Baby L. Moody was visiting London on April 15, 2021 when he joined Bafna-Louis and CBL for a luncheon that Individual-2 hosted at his tennis club. (Tr. 364-66.) Individual-2 had recently learned that Bafna-Louis was pregnant, and told Moody that he "intended to have [her] as his life partner and was loquacious and effervescent and excited." (Tr. 364-65.) Individual-2 was eager to conduct a prenatal paternity test and tried to enlist Moody's help in obtaining Bafna-Louis's participation in the test. (Tr. 366.) Individual-2 portrayed himself to Moody as "a very powerful man" and once offered to facilitate an introduction to Xi Jinping, the president of China. (Tr. 367-78.)

Bafna-Louis and Moody testified that Individual-2 became belligerent after Bafna-Louis reported the alleged rape to law enforcement. Individual-2 repeatedly called and rang the doorbell to the Bafna-Louis residence. (Tr. 180.) He collected her mail and redelivered it with handwriting on the envelopes. (Tr. 180.) He contacted her friends, family members, and CBL's school administrators to call her "a slut" and threaten to "destroy our lives." (Tr. 180.) Bafna-Louis stated, "He followed us, he harassed us." (Tr. 180.) She estimated that Individual-2 appeared at her home approximately once a week over a period of months. (Tr. 181.) The principal of CBL's school contacted her after receiving a call from Individual-2, and Bafna-Louis learned that Individual-2 had announced a plan to destroy CBL's academic future. (Tr. 183.) After Bafna-Louis moved to the United States, Individual-2 contacted her close friends,

her mother, the doorman of her building and her gym.  (Tr. 187.)  She stated that she contacted

London police about Individual-2 "multiple times" but that "[t]hey really didn't do very much"

following his initial arrest.  (Tr. 189.)

Moody testified that Individual-2 sent him "[a]ccusatory" and "ranting" texts

about Bafna-Louis.  (Tr. 368-69.)  The Court received into evidence a long series of text

messages between Individual-2 and Moody.  (RX 32.)  As submitted to the Court, the messages

are single-spaced, in small typeface, and proceed for 23 pages.  (Id.)  Individual-2 made scathing

and profane remarks about Bafna-Louis and boasted about his connections and importance on

the international stage.  Among other things, he wrote to Moody that "[CBL] will never get into

schools he wants given his mother's reputation," that "even your us Presidents do not have the

intricate global reach I do – hillbillies with cash can't reach quality" and "Noone [sic] ever gets

away with lying to me ; no one every [sic] takes my and my family name lightly and attacks with

falseties [sic]."  (Id.)

E.  Individual-3.

Individual-3 is a London-based barrister who, in late 2021 and early 2022, was

briefly engaged to marry Bafna-Louis.  For a period of time, Individual-3 was listed on Baby L's

birth certificate as the child's biological father, and Bafna-Louis adopted Individual-3's last

name after the two became engaged in late 2021.

On March 18, 2022, when Individual-3 was still identified as the father on Baby

L's birth certificate, Individual-3 physically removed Baby L from London to the United States

and delivered the infant to Bafna-Louis's mother in New York City.  (See, e.g., Tr. 305.)

Individual-3 has acted as Bafna-Louis's barrister in Family Court proceedings.  (Tr. 301.)

Individual-3 was included in the RBKC's safety plan for CBL in April and May 2022, and he

had supervisory and caretaking authority over CBL in Bafna-Louis's absence.  (Tr. 73.)  Bafna-Louis remains on good terms with Individual-3, who has submitted an affidavit on United Kingdom immigration law on her behalf in this proceeding.  (ECF 58.)

F.    The City of Westminster's Child Protection Plan.

On January 6, 2022, social workers for the City of Westminster held a Child Protection Conference and adopted a Child Protection Plan governing Bafna-Louis, CBL and Baby L.  (PX 5.)  The conference and plan arose "due to concerns" about the incident where Baby L fell from Bafna-Louis's arms and the effects of her apparent alcohol abuse on the children.  (Id. at RBKC001219.)  Jenny Bastock, the City of Westminster's lead social worker on the matter, testified: "When concerns have been raised around a parent's capacity to meet the needs of their children, a child protection conference can be held if agreed by the police child protection team."  (Tr. 19.)

The plan called for Bafna-Louis to engage with a social worker about her alcohol use and undergo regular alcohol testing, as well as for a social worker to monitor Baby L's health and development.  (PX 5 at RBKC001232-33.)  As to CBL, the plan called for him to attend school daily and to have his "wishes and feelings to be heard . . . ."  (Id.)

The City of Westminster proceeded to monitor the family and intervened when it believed the children's welfare was at risk.  On one visit to the family home, Bastock observed that Bafna-Louis "was under the influence" and "very, very drowsy."  (Tr. at 20-21, 26.)  She arranged for Individual-3 and a family friend to sign an agreement not to leave Bafna-Louis unsupervised with either child.  (Id.)  On March 17, 2022, which was the day before Baby L's removal to the United States, Bastock called an ambulance for Bafna-Louis during a home visit,

after she observed a potential alcohol poisoning or medication overdose.  (Tr. 33; PX 6 at RBKC001210-13.)

As will be discussed, the City of Westminster's implementation of the Child Protection Plan ended in April 2022, when Bafna-Louis and CBL relocated within London and became subject to oversight from the RBKC.

G.   The Removal of Baby L from England and Wales to the United States.

Individual-3 effectuated the removal of Baby L from England and Wales to New York City on March 18, 2022.  (See, e.g., Tr. 39, 165, 296, 305.)  At that time, Individual-3 was listed as Baby L's biological father on his birth certificate.  (Tr. 39, 165.)  When asked whether she believed Individual-3 was Baby L's father at that time, Bafna-Louis answered, "There was a chance [Individual-3] was the father at that time" but that she "was unsure."  (Tr. 165-66.)  Bafna-Louis testified that she participated in the decision to list Individual-3 on Baby L's birth certificate.  (Tr. 300-01.)

At the hearing, Bafna-Louis initially denied that she asked or instructed Individual-3 to remove Baby L to New York.  (Tr. 305.)  Bafna-Louis's testimony about the removal of Baby L was evasive.  Her responses first suggested that Individual-3 removed Baby L independently, and then, in follow-up questions, she acknowledged her participation in the scheme:

> Q. Did you ask [Individual-3] to take baby L to New York?
> A. No.
> Q. Did you tell [Individual-3] to take baby L to New York?
> A. No, [Individual-3] was the baby's father. I didn't have to tell him
>    or not tell him. We had a joint decisions and were raising the baby
>    as a family.
> Q. So that was just a joint decision that you didn't have to instruct
>    him to do?
> A. I don't instruct [Individual-3].
> Q. So it's a joint decision you came to together?

- 16 -

> A. I can't remember the exact circumstances.
> Q. But at some point, it was arranged that baby L was going to New York with [Individual-3]; agreed?
> A. [Individual-3] arranged baby L to go to New York with him.
> Q. With no consultation with you whatsoever?
> A. At the time, I was very unwell and I decided to go and get help for one month. I was inpatient for one month. The days leading up to that, I didn't have any discussions with [Individual-3] about exactly when he would be bringing baby L to New York. However, starting before Christmas, maybe even in Antigua, August '21, we had already decided to relocate with baby and CB-L.
> Q. So you know baby was going, you just say you didn't know the exact date?
> A. Yes.

(Tr. 305-06.)  After Baby L's removal, the child was left in the care of Bafna-Louis's mother, Christina Louis, who resides in Manhattan.  (See, e.g., RX 11.)

The United Kingdom's Child Abduction Act 1984 states that "a person connected with a child under the age of sixteen commits an offence if he takes or sends the child out of the United Kingdom without the appropriate consent," and that a "taking" or "sending" occurs where a person "causes or induces the child to accompany him or any other person . . . ."  (2d Craddock Dec. ¶¶ 9-10 & Ex. B.)  The English High Court has stated that Baby L "was wrongfully removed by [Individual-3] (acting as an agent of the Mother) out of the jurisdiction of England and Wales in breach of the rights of custody of the Court . . . ."  (PX 14 at 4 ¶ 2(c).)

This Court independently finds as a fact that it is more likely than not that Bafna-Louis, acting in concert with Individual-3, knowingly and willfully caused Baby L to be removed from the United Kingdom to the United States.  The finding is based on the admission of Bafna-Louis that, as a result of a joint decision with Individual-3, she knew Baby L would be taken to New York but did not know the exact date.  It is further based on the surrounding context, the evasive responses of Bafna-Louis and the improbability that an intimate partner would remove a

child from the country without the assent of the child's mother.  It is buttressed by the fact that Baby L was deposited with Bafna-Louis's mother and that Bafna-Louis took no steps to retrieve Baby L and return him to London.

H.  The Transfer of Supervision from the City of Westminster to the RBKC and the Commencement of Wardship and Care Proceedings in the High Court.

Shortly after Individual-3, acting in concert with Bafna-Louis, removed Baby L from the United Kingdom, the Westminster City Council brought proceedings against Bafna-Louis and Individual-3 in the High Court of Justice, Family Division (the "High Court").  (PX 12, 13.)  The proceeding resulted in an Order from the High Court that prohibited Bafna-Louis or Individual-3 from removing CBL from England and Wales and ordered them to arrange Baby L's return to the jurisdiction.  (PX 13 at RBKC001577-78.)

As noted, in April 2022, Bafna-Louis and CBL relocated within the Greater London area, from the Belgravia neighborhood under the jurisdiction of the City of Westminster to the Bina Gardens neighborhood under the jurisdiction of the RBKC.  (See, e.g., Tr. 306.)  In an Order of April 29, 2022, the High Court noted that "[n]o party objects and RBKC agree to being the designated local authority moving forward" and ordered that the RBKC "is designated as the applicant Local Authority moving forward."  (PX 13 at RBKC001602-03.)  That same Order denied Bafna-Louis's application to discharge the Wardship Proceedings.  (Id.)

In addition to the RBKC becoming a party to the Care and Wardship Proceedings, it became charged with implementing the Child Protection Plan first adopted by the City of Westminster.  (See, e.g., Tr. 64, 70-71.)  Nicola Shanks of the RBKC became the lead social worker on the case, and she visited and supervised CBL and Bafna-Louis when they were residing in London.  (Tr. 68-71; PX 15.)  Shanks also had several conversations and

communications with Individual-3, who was made part of a safety plan for CBL and provided supervision to CBL.  (PX 16; Tr. 73.)

I.   The Removal of CBL from the United Kingdom
     and Ongoing Proceedings Related to the Children.

Bafna-Louis removed CBL from England and Wales to New York City on or about May 16, 2022.  (RX 52 ¶ 1.)  Since that time, Bafna-Louis, CBL and Baby L have resided with Christina Louis on the Upper East Side of Manhattan.  (Tr. 381.)

Meanwhile, proceedings relating to CBL and Baby L have continued in the High Court.  In the Wardship Proceedings to which the RBKC is a party, the High Court issued multiple orders directing Bafna-Louis and/or Individual-3 to return the children to the jurisdiction, including orders of June 10, July 8, July 26, August 8, November 15 and December 13, 2022.  (PX 13.)  In Orders of November 15 and December 7, 2022, the High Court directed the Home Department of the United Kingdom to grant visas to Bafna-Louis, CBL and Baby L.  (PX 13 at RBKC002561-64.)

The High Court also has declared that Individual-1 has "parental responsibility" over Baby L.  In an oral ruling of August 23, 2022, a transcript of which was submitted by the RBKC, Mr. Justice Keehan of the High Court summarized a sealed order that found on the basis of DNA evidence that Individual-1 is the biological father of Baby L.  (PX 13 at RBKC002663.)  Justice Keehan granted a declaration of parentage to Individual-1 and stated that Individual-1 "has demonstrated his very clear commitment to the children."  (Id. at RBKC002664.)  He stated: "I have no hesitation in all of the circumstances of this case in concluding that it is entirely in the welfare best interest of [Baby L] that I grant [Individual-1] parental responsibility for him."  (Id. at RBKC002665.)  The order does not appear to grant Individual-1 unfettered rights as to Baby L.  Justice Keehan stated:

- 19 -

>A parental responsibility is principally, but not solely, a matter of status. The extent to which the father exercises his parental responsibility are, consequent upon its grant, what welfare orders are made in his favour, whether that is to spend time with or for the child to live with him, are entirely separate matters, as the Court of Appeals has made clear on various occasions.
>
>The issue of safeguarding checks, in my judgment, and of the character of [Individual-1], upon which I express no view, are of central importance to those issues of spending time with or living with orders. They are factors that must be considered when considering whether to grant parent responsibility, but they are by no means determinative.

(Id. at RBKC002664.)

While the hearing before the undersigned was underway, Janet Broadley, who is CBL's attorney in the High Court, filed a statement with the High Court that summarized CBL's views and positions as to the Care and Wardship Proceedings (the "Broadley Statement"). (RX 52.) The Broadley Statement was filed in connection with an application to the High Court that requests a stay of its return orders as to CBL. (Tr. 284, 286.) Counsel to the RBKC stated that the High Court is expected to hear CBL's application during the week of March 13, 2023 at the earliest. (Tr. 286.) This Court received the Broadley Statement into evidence without objection. (Tr. 287.) The RBKC urges that the Court should afford the statement little weight because it was offered on the last day of the hearing and includes observations consistent with Bafna-Louis's hearing testimony, suggesting that it is intended to function as advocacy on her behalf. (Pet. Proposed Findings ¶ 127.) The Court relies upon the Broadley Statement for certain background details on CBL's life but has not otherwise relied on it.[8]

---

[8] After the close of evidence, Bafna-Louis filed without explanation a psychologist's written evaluation of CBL that purports to opine on his intelligence and maturity. (ECF 76.) In an opposing letter-brief that attaches correspondence between counsel, the RBKC identifies the written evaluation as Respondent's proposed Exhibit 51, and notes that it was not moved into evidence at the hearing and is not a document that is properly subject to judicial notice. (ECF 77.) Bafna-Louis has not further explained why the document at ECF 76 ought to be received into

J.   The False Report of Baby L's Death in December 2022.

On December 12, 2022, a person who Nicola Shanks of the RBKC believed to be Bafna-Louis called from a New York phone number and announced that she had dropped Baby L, and that Baby L was hospitalized at Weill-Cornell Hospital "and unlikely to make it through the night."  (Tr. 82-85; PX 20, 23.)  Shanks received two separate calls that night, one from a caller who identified herself as Nikki Goldberg and another who identified herself as Bafna-Louis.  (Tr. 99-100.)  Based on Shanks's familiarity with Bafna-Louis's voice, she believes that both calls were made by Bafna-Louis.  (Tr. 99-101.)  In slurred speech, the caller proceeded to discuss the Wardship Proceedings and this Hague Convention proceeding, and uttered personal insults about Shanks and another social worker.  (PX 23.)

Emails of December 13 and 14, 2022, from an account of "chirs connis" purported to announce the death of Baby L and identify funeral arrangements.  (PX 20.)  That email account belonged to Bafna-Louis, who shared it with two of her friends.  (Tr. 265-66.)

A flurry of activity followed, and the report of Baby L's hospitalization and death was quickly discovered to be false.  (Tr. 100-02; 129-30.)  Shanks contacted the New York City Police Department and her counterparts in the New York Child Protective Services, who "confirmed that Baby L was alive and well."  (Tr. 102; see also PX 23.)

At the hearing, Bafna-Louis denied participation in the false report.  (Tr. 234-40.) She stated that she has used multiple personal email accounts and online pseudonyms over the years, and that she believes her accounts may have been compromised or hacked to send false reports about Baby L.  (Tr. 239-40.)  In her post-hearing memorandum, Bafna-Louis describes

---

evidence.  Because the psychologist's evaluation was not offered into evidence at the hearing, not accompanied by a declaration and is not subject to judicial notice, it is not received into evidence.  If it were considered as evidence, it would not alter the Court's conclusion, reached without consideration of the evaluation, that CBL is of an age and maturity that his view should be taken into account.

the report as an "outlandish hoax" likely carried out by Individual-1 and Individual-2. (Resp. Mem. at 15.)

Ultimately, the false report of December 12 does not have a significant role in the Hague Convention analysis, and the Court need not make findings about its origins. At most, the response of Shanks and the RBKC in contacting New York City authorities for further investigation is some evidence of the RBKC's ongoing interest in the care of Baby L.

### K. The RBKC's Proposed Plan for the Return of Baby L and CBL.

In a filing to the High Court dated November 25, 2022, Shanks described the RBKC's proposed plan in the event that Bafna-Louis and the children return to England and Wales. (PX 22.) The RBKC will pay up to £3,000 per month on housing for the family on a property chosen by Bafna-Louis. (Id.) It does not seek to separate the children from their mother. (Id.) A support worker would provide 24/7 supervision and support upon their initial return. (Id.) A team would assess Bafna-Louis's substance use, mental health and parenting capacity. (Id.) The RBKC would facilitate CBL's schooling, either remotely, through a state-funded school or in a private school paid by Bafna-Louis. (Id.) The RBKC would not oppose the participation of the maternal grandmother, Christina Louis, in the program. (Id.) The assessment would last for approximately 12 weeks. (Id.)

CONCLUSIONS OF LAW.

IV.    <u>The RBKC Has Made Out a Prima Facie Case for the Return of CBL and Baby L.</u>

A.    The RBKC Has Met Its Burden of Establishing that CBL and Baby L Were
<u>Habitual Residents of the United Kingdom at the Time of Removal.</u>

1.    Relevant Factors for Determining a
<u>Child's Country of Habitual Residence.</u>

"The Hague Convention does not define the term 'habitual residence.'" <u>Monasky</u>,

140 S. Ct. at 726.  "'Habitual' implies '[c]ustomary, usual, of the nature of a habit,'" with the

residence being something "more than transitory."  <u>Id.</u> (quoting Black's Law Dictionary 1176

(5th ed. 1979)).  Determining habitual residence is "a fact-sensitive inquiry, not a categorical

one."  140 S. Ct. at 726.  The issue of "habitual residence" is different than "formal legal

concepts like domicile and nationality" and should be applied with "maximum flexibility."  <u>Id.</u> at

727.  "The aim: to ensure that custody is adjudicated in what is presumptively the most

appropriate forum – the country where the child is at home."  <u>Id.</u>

"[C]ourts must be sensitive to the unique circumstances of the case and informed

by common sense."  <u>Id.</u> (quotation marks omitted).  "A child's habitual residence depends on

numerous factors with the purposes and intentions of the parents being merely one of the

relevant factors."  <u>Id.</u> at 728 (quotation marks and ellipsis omitted).  "For older children capable

of acclimating to their surroundings, courts have long recognized, facts indicating

acclimatization will be highly relevant."  <u>Id.</u>  Concerning such older children:

> Facts courts have considered include: "a change in geography
> combined with the passage of an appreciable period of time," "age
> of the child," "immigration status of child and parent," "academic
> activities," "social engagements," "participation in sports programs
> and excursions," "meaningful connections with the people and
> places in the child's new country," "language proficiency," and
> "location of personal belongings."

Id. at 727 n.3 (quoting Federal Judicial Center, J. Garbolino, The 1980 Hague Convention on the Civil Aspects of International Child Abduction: A Guide for Judges at 67-68 (2d ed. 2015)).

As to infants, a "mere physical presence . . . is not a dispositive indicator of an infant's habitual residence. But a wide range of facts . . . including facts indicating that the parents have made their home in a particular place, can enable a trier to determine whether an infant's residence in that place has the quality of being 'habitual.'" Id. at 729. "When all the circumstances are in play, would-be abductors should find it more, not less, difficult to manipulate the reality on the ground, thus impeding them from forging artificial jurisdictional links with a view to obtaining custody of a child." Id. (quotation marks and ellipsis omitted).

"No single fact, however, is dispositive across all cases. Common sense suggests that some cases will be straightforward: Where a child has lived in one place with her family indefinitely, that place is likely to be her habitual residence. But suppose, for instance, that an infant lived in a country only because a caregiving parent had been coerced into remaining there. Those circumstances should figure in the calculus." Id. at 727.

It bears emphasizing that under the text of Article 3(a) of the Convention, the habitual-residence analysis looks to the state "in which the child was habitually resident immediately before the removal . . . ." (emphasis added); accord Monasky, 140 S. Ct. at 726 ("The place where a child is at home, at the time of removal or retention, ranks as the child's habitual residence.") (emphasis added).

2.  CBL Was a Habitual Resident of the United
Kingdom Immediately Before His Removal.

CBL was born in France in 2009. (Tr. 140) He lived in New York City from 2010 until approximately 2013 or 2014, and he has memories of attending nursery school in New York. (RX 52.) He is a citizen of the United States and Hungary. (Tr. 140)

While the Court ultimately concludes that CBL was a habitual resident of the United Kingdom, it has considered all contrary evidence.  For example, CBL travels on a passport issued by the United States.  (RX 13.)  Bafna-Louis testified that CBL has built meaningful friendships in the United States through his attendance at a summer camp in Maine and time residing in Manhattan.  (Tr. 241)  She testified that she always intended for CBL to return to the United States to attend high school and college.  (Tr. at 151.)  Since relocating to London as a young child, CBL has visited the United States four or five times a year, sometimes as an unaccompanied minor.  (RX 52.)  He has extended family in and around New York City, including his maternal grandmother, who resides on the Upper East Side, as well as extended family in Syracuse.  (Tr. 241.)  These factors lend some weight to finding that the United States is CBL's place of habitual residence.

The greater weight of the evidence, however, supports the conclusion that the United Kingdom was his country of habitual residence immediately before his removal.  Since 2013 or 2014, CBL has principally resided in London, including the Belgravia apartment that the family occupied for approximately five years.  (Tr. 154.)  CBL attended a private preparatory school that was an approximately eight-minute walk from their home.  (Tr. 319.)  In a statement submitted to the Family Court on December 17, 2021, Bafna-Louis described CBL as "happy and settled in an English school . . . ."[9]  (PX 27 ¶ 14.)  He participated in extra-curricular sports that included soccer and fencing, and, to a lesser extent, cricket.  (Tr. 320.)  CBL has a strong interest in drama, but the school did not offer drama as an extra-curricular program, so Bafna-Louis arranged for him to participate in a London-based drama program outside of school.  (Tr.

---

[9] Bafna-Louis asserted that this statement to the Family Court was hastily written by Individual-3 and submitted on her behalf.  (Tr. 303-05, 310-12.)  But she has not asserted that the statement was fraudulent or filed against her wishes, and there is no suggestion that she has attempted to withdraw or clarify its contents to the Family Court.

320-21.)  A social worker's notes from a meeting with CBL dated April 7, 2022 state that CBL expressed a desire "[t]o have all of his family in London at the same time."  (PX 7.)  The record also demonstrates that CBL's personal belongings were kept long term in the United Kingdom. Bafna-Louis testified that approximately 60 boxes of family belongings had been shipped or remained in transit from London to New York.  (Tr. 154.)

The approximately eight- or nine-year duration of CBL's time residing in London, his schooling in London, the location of his personal possessions, and his integration into the London-based daily routines of an active and thriving young person all weigh strongly in favor of finding the United Kingdom to be the country of habitual residence at the time of removal. Before 2022, CBL's international travels all concluded with his return to a home in London.  The record shows that prior to the events of late 2021, CBL enjoyed a safe and comfortable life in London.

The Court therefore finds and concludes that the RBKC has proven that the United Kingdom was the country of CBL's habitual residence immediately before removal.

3.  Baby L Was a Habitual Resident of the United
Kingdom Immediately Before His Removal.

Determining Baby L's place of habitual residence is complicated by his young age, his contested paternity and the role of public entities in his care and supervision.  However, as with CBL, the Court comfortably finds and concludes that the United Kingdom was the country of Baby L's habitual residence at the time of his removal.

The Court credits Bafna-Louis's testimony that prior to Baby L's birth, she intended to relocate to New York with both children, and that she took preparatory steps to effect this relocation before and after the birth, including changing wireless providers, selling furniture, preparing to ship belongings, and moving out of the Belgravia home.  (Tr. 154.)  The intent to

relocate would be consistent with CBL's New York-based upbringing as a small child and the New York presence of Bafna-Louis's mother.  The Court affords some weight to Bafna-Louis's intentions, which weigh in favor of viewing the United States as Baby L's habitual place of residence.  The Court likewise affords weight to Bafna-Louis's status as a United States citizen.

But the remaining relevant factors weigh in favor of finding the United Kingdom to be Baby L's country of habitual residence.  Baby L was born in October 2021 in London.  (Tr. 140-41, 198)  The United Kingdom issued a passport to Baby L.  (RX 13.)  At the time of his birth, Bafna-Louis had long maintained a residence in London.  While Bafna-Louis traveled internationally for personal and professional reasons, in the months and years prior to Baby L's birth, she resided principally in a flat in the Belgravia neighborhood.  The situs of Baby L's birth, his months in London prior to removal, and Bafna-Louis's longtime presence in England and Wales weigh in favor of finding that the United Kingdom was Baby L's country of habitual residence at the time of his removal to the United States.

The City of Westminster also exercised supervisory authority over Baby L prior to his removal.  The child-protection plan for both children was put into place on January 6, 2022.  (PX 5.)  Tailoring the habitual-residence analysis to the circumstances of this case, the close involvement of the City of Westminster in monitoring and tending to the welfare of Baby L from the time that he was a few weeks old until his removal in March 2022 also weighs in favor of finding that he habitually resided in the United Kingdom.

The physical location of Baby L's biological father, and the court proceedings related to him, also weigh in favor of finding a habitual residence in the United Kingdom.  As discussed, proceedings in the Courts of England and Wales have determined that Individual-1 is the biological father of Baby L, and the High Court has declared that Individual-1 has parental

responsibility for Baby L. (PX 13 at RBKC002664.) Individual-1 has filed no submissions in this case and has not asked to be heard. In this Hague Convention proceeding, the Court expresses no view as to what parental rights, if any, Individual-1 should be permitted to exercise in the case of Baby L. These are matters for the Courts of England and Wales. However, the Court must consider "a wide range of facts" in determining the country of habitual residence. Monasky, 140 S. Ct. at 729. The biological father's physical presence in the United Kingdom and the ongoing proceedings in the courts of England and Wales concerning his rights in relation to Baby L is a relevant factor in concluding that Baby L was a habitual resident of the United Kingdom at the time of his removal.

Based on the foregoing, the Court finds and concludes that Baby L was a habitual resident of the United Kingdom prior to his removal.

B.  The Removal of CBL and Baby L Breached the RBKC's
    Rights of Custody under the Laws of the United Kingdom.

1.  Factors Relevant to Determining a Right
    of Custody under the Convention.

The second requirement to make out a prima facie case is for the petitioner to prove by a preponderance of the evidence that "the removal or retention was in breach of the petitioner's custody rights under the law of the State of habitual residence . . . ." Hofmann v. Sender, 716 F.3d 282, 291 (2d Cir. 2013).

In deciding rights of custody, a court consults the laws of the child's country of habitual residence and follows the text and structure of the Convention. Abbott, 560 U.S. at 10. "The rights of custody . . . may arise in particular by operation of law or by reason of a judicial or administrative decision . . . ." Convention Art. 3. The Convention also states that "'rights of

custody' shall include rights relating to the care of the person of the child and, in particular, the right to determine the child's place of residence." Id. Art. 5(a).

Abbott held that a court-issued ne exeat order can establish a right of custody under the Convention. 560 U.S. at 10-15. In Abbott, a Chilean court granted a parent's application for a ne exeat order, which, under the laws of Chile, required that parent's authorization before the child could be taken out of the country. Id. at 10. The Supreme Court concluded that under the Convention and Chilean law, a parent's joint right to determine a child's country of residence was a joint right of custody. Id. at 11-12 (quoting Convention Art. 5(a)). "That a ne exeat right does not fit within traditional notions of physical custody is beside the point. The Convention defines 'rights of custody,' and it is that definition that a court must consult." 560 U.S. at 12. "Even a ne exeat order issued to protect a court's jurisdiction pending issuance of further decrees is consistent with allowing a parent to object to the child's removal from the country." Id. at 14.

"Although the vast majority of cases involve parents or relatives claiming custody rights, administrative agencies or other bodies may claim custody rights." East Sussex Children Services v. Morris, 919 F. Supp. 2d 721, 730 (N.D.W.Va. 2013) (collecting cases). In East Sussex, the Court concluded that a public authority in England and Wales had custody rights over a removed child where it enacted a child-protection plan prior to removal, and, "[m]ost importantly," a county court had entered an order requiring surrender of the child's passport and barring the mother from removing the child without court permission. Id. at 731. The existence of a ne exeat order "conferred custody rights upon the court" later asserted by the public authority. Id. at 731-32.

2.  <u>The RBKC Had Rights of Custody over CBL at the Time of Removal.</u>

The RBKC has proven by a preponderance of the evidence that under section 3(a) of the Convention and the laws of the contracting State, <u>i.e.</u> the United Kingdom, it had rights of custody over CBL at the time of his removal.

Article 14 of the Convention provides that a court may "take notice directly of the law of, and of judicial or administrative decisions, formally recognized or not in the State of the habitual residence of the child, without recourse to specific procedures for the proof of that law or for the recognition of foreign decision which would otherwise be applicable." The RBKC offered direct testimony by affidavit from Simon Craddock, who identifies himself as a solicitor and lawyer in good standing in England and Wales.[10] (PX 1; ECF 14.) Craddock notes that CBL was the subject of Wardship Proceedings before the High Court. (Craddock Dec. ¶ 7.) In a Wardship Proceeding, the High Court exercises its inherent jurisdiction to protect a child. (<u>Id.</u>) Craddock states, "When a child is made a Ward of the English High Court, the English High Court has parental responsibility for the child." (<u>Id.</u>) The United Kingdom's Children Act of 1989, at Part 1 Section 3, defines "Parental Responsibility" as "all the rights, duties, powers, responsibilities and authority which by law a parent of a child has in relation to the child and his property." (Craddock Dec. Ex. B.)

As part of the Wardship Proceeding, the High Court declared CBL to be a Ward of the Court and prohibited his removal from the jurisdiction. On March 22, 2022, shortly after the removal of Baby L, the City of Westminster made an <u>ex parte</u> application to the High Court for a prohibited-steps order governing CBL, which was granted. (PX 12.) The Order was directed to Bafna-Louis and Individual-3, and stated that CBL "is and shall remain a Ward of

---

[10] Bafna-Louis did not offer a statement or counter-statement on the laws of the United Kingdom.

this court during his minority or until further order," and that Bafna-Louis and Individual-3

"shall not remove or instruct or encourage any other person to remove [CBL] from England and

Wales."  (Id.)  After Bafna-Louis and Individual-3 had an opportunity to be heard, an Order of

March 24, 2022 reiterated CBL's status as a Ward of the Court and again prohibited his removal.

(Id.)  On April 4, 2022, the High Court filed additional orders that reaffirmed CBL's status as a

Ward and barred Bafna-Louis or Individual-3 from removing CBL or facilitating his removal.

(Orders of 4/4/22 (PX 13 at RBKC001577, RBKC001377).)

       A more recent Order of the High Court addressed to this Hague Convention

proceeding expressly asserts the High Court's rights of custody.  On November 15, 2022, Mr.

Justice Keehan of the High Court issued an Order pursuant to Article 15 of the Convention (the

"Article 15 Order").[11]  (ECF 25-1; PX 14.)  Regarding CBL, the Article 15 Order stated that he

was a Ward of the High Court at the date of his removal, continues to be a Ward of the High

Court, and that the High Court "has primary welfare jurisdiction in all matters of parental

responsibility concerning the said children."  (Id.)

       By declaring CBL a Ward of the Court and issuing an order barring his removal,

the High Court asserted custody rights pursuant to the laws of England and Wales.  As discussed

in Abbott, the entry of a ne exeat order can establish a right of custody under the Convention,

which includes under Article 5(a) "the right to determine the child's place of residence."  See

Art. 5(a); Abbott, 560 U.S. at 10-15; East Sussex, 919 F. Supp. 2d at 731-32.  While entry of a ne

exeat order alone would be sufficient to demonstrate custody rights, declaring CBL to be a Ward

---

[11] Article 15 states: "The judicial or administrative authorities of a Contracting State may, prior to the making of an order for the return of the child, request that the applicant obtain from the authorities of the State of the habitual residence of the child a decision or other determination that the removal or retention was wrongful within the meaning of Article 3 of the Convention, where such a decision or determination may be obtained in that State." This Court notes that it did not request a "decision or determination" from the High Court of England and Wales but welcomes its submission.

of the High Court further demonstrates the High Court's custody rights.  (UK Children Act of 1989, Pt. 1 § 3.)

Under the laws of England and Wales, a local authority such as the RBKC is charged with effectuating the orders of the High Court.  The Article 15 Order states that "[t]he Local Authority has locus to bring an application for the summary return of the wards to the jurisdiction of England and Wales on behalf of the court . . . ."  (PX 14 at 4 ¶ 3.)  Craddock states: "The English High Court is a holder of parental responsibility for its Wards and designates the local authority as the party/applicant for proceedings relating to the Wards in accordance with the English High Court's Procedural Rule 12.3."  (Craddock Dec. ¶ 8.)  Rule 12.3 states that a local authority, with the High Court's permission, is the designated applicant for orders relating to the court's inherent jurisdiction, including Wardship Proceedings.  (Craddock Dec. Ex. A at RBKC002729.)  The Rule also provides that "[a]ny . . . institution or body" that claims that a child has been wrongfully removed may apply for an order that relates to the Hague Convention.  (Id. at RBKC002731.)

The RBKC has therefore demonstrated that, as the designated applicant for enforcing the High Court's orders, it may assert the High Court's rights of custody over CBL at the time of his removal.  See Convention Art. 3 ("The rights of custody . . . may arise in particular by operation of law or by reason of a judicial or administrative decision . . . ."); Abbott, 560 U.S. at 14 ("Even a ne exeat order issued to protect a court's jurisdiction pending issuance of further decrees is consistent with allowing a parent to object to the child's removal from the country."); East Sussex, 919 F. Supp. 2d at 731-32.

The Court separately concludes that the adoption and implementation of the child protection plan by the City of Westminster and the RBKC demonstrates the RBKC's rights of

custody over CBL.  (PX 5.)  The plan initially adopted by the City of Westminster called for "[f]ortnightly" visits from lead social worker Jenny Bastock, with a safety goal to see that CBL and Baby L had "a safe, stable and settled home environment" and that their "health and educational needs" and "developmental milestones" were met.  (Id. at RBKC001232-33.)  It also listed a goal for the children "to be happy and thriving in their mother's care where they are not being exposed [sic] drinking/alcohol misuse or parental conflict."  (Id. at RBKC001233.)

Evidence reflects the involvement of the City of Westminster and the RBKC between January 2022 and CBL's removal the following May.  This includes making follow-up inquiry after CBL's school reported a concern that Bafna-Louis was under the influence of alcohol; follow up after learning that CBL and Individual-3 found three full vodka bottles secreted in a garden; follow up about CBL's supervision after Individual-3 informed the local authority that CBL would be "left alone" or "on his own" for several days in March or April 2022; an announced at-home visit to CBL on March 22, 2022; a child-protection conference held by the RBKC on April 6, 2022, which included observations that CBL thrived socially and academically at school, and listed as a goal that CBL "will feel supported and have space to express his feelings"; an unannounced visit to CBL on April 7, 2022; an announced visit of May 10, 2022, in which CBL and Shanks discussed CBL's relationship with his mother and younger brother; and numerous emails and phone calls between Individual-3 and social workers at Westminster and the RBKC, which often touched on aspects of CBL's welfare.  (PX 7, 8, 9, 10, 15, 16, 17.)

Upon learning that Individual-3 and Bafna-Louis intended for CBL to be "left alone" or "on his own" for an unspecified period in April or May 2022, Bastock sought more information concerning possible childcare providers and contact information.  (PX 10.)  In a

filing to the High Court, Bastock noted that CBL "remains a child subject to a Child Protection

Plan, and therefore it is reasonable to request that this information is provided in order that I can

carry out my duties pursuant to the Plan." (PX 9 at RBKC001680.)

    Thus, in the months prior to CBL's removal from the United Kingdom, social

workers at the City of Westminster and the RBKC actively monitored and provided input on key

aspects of his welfare and upbringing, including his schooling, family relationships and

childcare.  The City of Westminster and its successor the RBKC therefore had rights of custody

under the laws of the United Kingdom prior to CBL's removal from the United Kingdom.  See

East Sussex, 919 F. Supp. 2d at 731.

    The Court therefore finds and concludes that the RBKC has demonstrated that it

had rights of custody over CBL at the time of his removal.

    3. The Family Court Had Rights of Custody over Baby L at the Time of
      Removal, which Are Delegated under United Kingdom Law to the RBKC.

    As to Baby L, the relevant pre-removal orders of the English courts and the role

of the City of Westminster differ from those pertaining to CBL.  Baby L had not been declared a

Ward of the High Court prior to his removal.  The RBKC's custodial rights over Baby L turn on

prohibited-steps orders in the Family Court proceeding commenced by Individual-1 and the care

plan implemented by the City of Westminster.  While the existence of RBKC's custodial rights

presents a somewhat more complicated question for Baby L than for CBL, the Court concludes

that RBKC has demonstrated its custodial rights over Baby L under the Convention and the laws

of England and Wales at the time of his removal.

    As noted, Individual-1 commenced a proceeding in Family Court against Bafna-

Louis in or around December 2021, in which he asserted paternity over Baby L and "applied for

a child arrangements order . . . ."  (PX 11; RX 6.)  In an Order of December 15, 2021, the Family

Court issued without notice an order prohibiting Bafna-Louis from removing Baby L from the jurisdiction.  (RX 6.)  The Order stated that "this court wants to ensure the child remains within the jurisdiction for appropriate orders to be made in the best interests of the child and yet does not want to jeopardise any reasonable temporary plans that the mother has already in hand . . . ."  (RX 6.)

On December 16, 2021, that prohibited-steps Order was confirmed on notice to Bafna-Louis.  (PX 11.)  In an Order of March 10, 2022, the Family Court issued an Order stating in part: "The mother must not remove the child from the jurisdiction of England and Wales until further order."  (PX 11.)

As has been discussed, Individual-3 then removed Baby L from the United Kingdom to New York City on March 18, 2022.  (See, e.g., PX 12.)  The High Court found this to be a wrongful removal in breach of Family Court orders.  (Id.)  In its Orders, the High Court has stated that Bafna-Louis's retention of Baby L was "in breach of the rights of custody of the Court."  (PX 13 at RBKC001626, 001641.)

Article 5(a) of the Convention defines "rights of custody" to include "rights relating to the care of the person of the child and, in particular, the right to determine the child's place of residence . . . ."  Abbott concluded that, under the laws of Chile, entry of a ne exeat order prevents a parent from "unilaterally" establishing a child's place of residence.  560 U.S. at 10.  Even if a ne exeat right amounts to "a mere 'veto,'" such a "truncated description" still established "an essential role in deciding the [child's] country of residence."  Id. at 12.

While Abbott involved the rights afforded to an objecting parent, the text of the Convention and ICARA expressly recognize that an entity may have rights of custody.  Abbott also requires this Court to determine rights of custody in consultation with the laws of the child's

- 35 -

country of habitual residence, <u>see</u> 560 U.S. at 10, and here, the Article 15 Order of the High

Court, the Craddock Declaration and the orders issued in the Wardship Proceeding conclusively

state that the Family Court assumed rights of custody when it issued <u>ne</u> <u>exeat</u> orders over Baby

L. <u>See also</u> <u>East Essex</u>, 919 F. Supp. 2d at 731-32 (a county court's requirement to surrender the

child's passport was a <u>ne</u> <u>exeat</u> order that "conferred custody rights upon the court.").  Judicial

power under a <u>ne</u> <u>exeat</u> order and the RBKC's delegated powers of enforcement may differ from

how concepts of custody are discussed in everyday parlance, but <u>Abbot</u> advises:

> The Convention defines 'rights of custody,' and it is that definition
> that a court must consult.  This uniform, text-based approach ensures
> international consistency in interpreting the Convention.  It
> forecloses courts from relying on definitions of custody confined by
> local law usage, definitions that may undermine recognition of
> custodial arrangements in other countries or in different legal
> traditions, including the civil-law tradition.

560 U.S. at 12.  Thus, under the laws of England and Wales, the Family Court had rights of

custody over Baby L at the time of his removal, and the enforcement of those may be asserted by

the RBKC under the laws of the United Kingdom.

Additionally, for largely the same reasons discussed as to CBL, the adoption and

implementation of the child protection plan by the City of Westminster also demonstrates

custody rights of the RBKC, which has assumed responsibility over the children from

Westminster.  The City of Westminster became involved when it feared "significant injury or

loss of life" to Baby L.  (PX 5 at RBKC001223.)  On March 2, 2022, Bastock attempted to visit

Baby L, but Bafna-Louis was at a hotel with a friend, and neither responded to phone calls.  (PX

8 at RBKC 001668.)  Bastock requested police assistance, and the next day, with police present,

she visited Bafna-Louis and Baby L at the hotel.  (<u>Id.</u> at RBKC 001668-69.)  Social workers

made an unannounced visit on March 17, 2022, and recorded concerns about Bafna-Louis's

handling of Baby L.  (PX 10 at RBKC 002556-57.)  At a home visit with Individual-3 and

Bafna-Louis on March 18, 2022, Bastock scheduled a visit for March 22, 2022.  (PX 8 at RBKC

001669-70.)  In another incident, after Individual-3 stated that Baby L was sometimes left in the

care of a family friend named "Terry," police checks were made of Terry, and Terry "was not

considered an appropriate person to provide [Baby L's] care needs."  (PX 10 at RBKC002555.)

Health visitors also recorded concerns with how Bafna-Louis changed Baby L's diaper and

believed that she was under the influence of alcohol at the time of their observation.  (Id.)

Thus, for the approximately 10-week period between the adoption of the child

protection plan and Baby L's removal, the City of Westminster intensively exercised "rights

relating to the care of the person of the child" under Article 5(a).  Those rights transferred to the

RBKC once Bafna-Louis moved to the RBKC's jurisdiction.  Separate from the Family Court's

ne exeat order, the implementation of the child protection plan demonstrates that the RBKC, as

successor to the City of Westminster, had rights of custody over Baby L at the time of removal.

C.   The RBKC Actually Exercised Rights of Custody Over CBL
     and Baby L at the Time of Removal.

The RBKC has proven by a preponderance of the evidence that it exercised rights

of custody over CBL and Baby L at the time each of them was removed under Convention

Article 3(b).  Article 3(b) provides that a removal is wrongful where "at the time of removal . . .

rights [of custody] were actually exercised, either jointly or alone, or would have been so

exercised but for the removal or retention."

First, both children were removed in violation of ne exeat orders.  Abbott held

that the removal of a child in violation of a ne exeat order breaches the inchoate rights of a non-

consenting custodian – in this case, the courts of England and Wales.  Abbot explained:

> [A] ne exeat right is by its nature inchoate and so has no operative
> force except when the other parent seeks to remove the child from
> the country.  If that occurs, the parent can exercise the ne exeat right
> by declining consent to the exit or placing conditions to ensure the
> move will be in the child's best interests.  When one parent removes
> the child without seeking the ne exeat holder's consent, it is an
> instance where the right would have been "exercised but for the
> removal or retention."

560 U.S. at 13 (quoting Convention Art. 3(b)).  By entering ne exeat orders, the Family Court

attained inchoate rights of custody over Baby L and the High Court attained inchoate rights over

CBL.  The laws of the United Kingdom, as cited above, permit the High Court to designate the

local authority to enforce its rights, which it has done.  (See discussion of the High Court's

Procedural Rule 12.3.)  Accordingly, under Article 3(b) and the laws of the United Kingdom, the

High Court's custodial rights under the non-removal orders existed and were exercised by reason

of its imposition of the non-removal orders at the time of removal of CBL and Baby L, and the

RBKC may assert those rights on behalf of the High Court.

Separately, the implementation of the child protection plan by the City of

Westminster and its successor the RBKC were a direct exercise of custodial rights over Baby L

and CBL.  As discussed, the City of Westminster and the RBKC exercised considerable

supervisory authority over the two children and closely scrutinized numerous aspects of their

well-being.  "[I]n applying the Convention, U.S. courts, including in this District, have generally

treated relatively minimal parental involvement as sufficient to establish the exercise of rights of

custody."  Poix v. Susibel Altagracia Espaillat Santana, 2022 WL 9847347, at *9 (S.D.N.Y. Oct.

17, 2022) (Cronan, J.) (collecting cases).  Exercising the rights of custody is not equivalent to

being the primary care-taker, and may be demonstrated by evidence of regular visits, intermittent

care, guidance in determining where the child attends school, looking after medical needs, or

providing for a vacation.  See Armiliato v. Zaric-Armiliato, 169 F. Supp. 2d 230, 240 (S.D.N.Y. 2001) (Pauley, J.).

The Court therefore finds and concludes that at the time of their removal, the High Court, whose rights are properly asserted in this Court by the RBKC, and the RBKC itself, had rights of custody over CBL and Baby L that were actually exercised at the time of removal.

V.    Based on CBL's Age and Degree of Maturity, the Court
      Defers to His Views and Declines to Order His Return.

Article 13 of the Convention states that "[t]he judicial or administrative authority may also refuse to order the return of the child if it finds that the child objects to being returned and has attained an age and degree of maturity at which it is appropriate to take account of its views."  "[U]nder this provision, a court may refuse repatriation solely on the basis of a considered objection to returning by a sufficiently mature child." Blondin v. Dubois, 238 F.3d 153, 166 (2d Cir. 2001), abrogated on other grounds by Golan, 142 S. Ct. 1880.  "[T]he child's maturity is a question for the district court, to be determined upon the specific facts of each case." Johnson v. Johnson, 2011 WL 569876, at *7 (S.D.N.Y. Feb. 10, 2011) (Berman, J.). "[T]here is no precise age at which a child will be deemed sufficiently mature under the Convention." Laguna v. Avila, 2008 WL 1986253, at *9 (E.D.N.Y. May 7, 2008) (Vitaliano, J.).

The undersigned conducted in in camera interview of CBL on February 2, 2023 that lasted approximately two hours and fifteen minutes.  Also present were two of CBL's attorneys and the undersigned's Law Clerk.  Bafna-Louis was not present, nor was any party's attorney.[12]  The interview was not transcribed.  The undersigned began the interview with an informal tour of the Moynihan and Thurgood Marshall Courthouses, and explained the Court's

---

[12] To avoid doubt, statements made by CBL at his unsworn interview are considered by the Court only on the age-and-maturity issues and the independence, depth and degree of thoughtfulness of his objection to a Court-ordered return to the United Kingdom.  They are not considered for any other purpose.

role under the Hague Convention and the purpose of the interview.  CBL was told that he could

speak in private with his attorneys at any time he wished.  CBL's counsel was advised that they

could object to any question posed by the Court, and, at the conclusion of the interview, counsel

accepted the Court's invitation to ask additional questions.

Based on CBL's words and demeanor, the undersigned finds that CBL possesses

great maturity and insight for a person of his age, and understands the complexities and nuances

of his situation.  CBL articulated concrete and well-considered reasons for his desire to remain in

New York and not to return to the United Kingdom.  Accordingly, the Court will exercise its

discretion to defer to CBL's views and will not order his return to England and Wales.

CBL is now thirteen years old.  He described his school life in both New York

City and London in positive terms.  In both cities, he has built strong friendships with classmates

and good relationships with teachers, and participated in an impressive variety of extra-curricular

clubs and sports.  CBL expressed particular enthusiasm for playing soccer and performing in

school plays.  His interest in drama has led him to consider a future acting career, but he

acknowledged that it is difficult to succeed as an actor, so that it may be more practical to pursue

a career where he can build leadership skills, such as one in entrepreneurship.

As recounted by CBL, the happy life that he once enjoyed in London became

turbulent and disorienting in late 2021, due to his mother's reliance on alcohol and the actions of

Individual-1 and Individual-2.  The undersigned read aloud from a detailed passage of the

Broadley Statement submitted by his lawyer on his behalf in the High Court proceedings that

summarized CBL's experiences during Bafna-Louis's months-long substance-abuse episode of

late 2021 and early 2022.  (RX 52 ¶ 23(g).)  As summarized in the Broadley Statement, CBL

described the time as frightening and stressful, and he feared that his mother was unable to care

for him and Baby L.  (Id.)  When invited to comment on the passage, CBL confirmed its accuracy, and described it as "a perfect summary" of the time.

CBL described his once-friendly relationship with Individual-1: they sometimes played chess and a FIFA soccer video game, and Individual-1 provided emotional support and adult companionship to CBL when Bafna-Louis was struggling with alcohol use.[13]  However, according to CBL, Individual-1's behavior began to change in late 2021: he would arrive unannounced and intoxicated, and CBL described an incident where he secretly observed Individual-1 physically abuse Bafna-Louis.  CBL stated that he watched from a staircase bannister while Individual-1 entered the home and struck Bafna-Louis's head against a wall.  He remained hidden until Individual-1 left, at which point he ran down the staircase and assisted his mother.

As to Individual-2, CBL stated that he retaliated against Bafna-Louis by calling CBL's school and prospective high schools, and telling administrators that CBL was a bad student who came from a bad family.  CBL described the calls as very upsetting, and expressed concern that the calls damaged his reputation among his teachers, even if the teachers afforded no weight to Individual-2's remarks and considered the calls odd.  CBL also described one incident in which he was walking home from school and realized that Individual-2 was in a car behind him.  CBL volunteered that Individual-2 may not have intentionally followed him, but that the incident was nonetheless upsetting, and that he immediately told his mother about it.

CBL described a high degree of comfort with his life in Manhattan and the United States.  He described a close and warm relationship with his Manhattan-based maternal grandmother.  CBL stated that throughout his childhood he has visited her three or four times a

---

[13] CBL's description is consistent with the text exchanges between CBL and Individual-1 that were received into evidence at Plaintiff's Exhibit 18.

year for a week or two at a time, and that in recent years, he made approximately half of those trips as an unaccompanied minor.  CBL stated that his mother has been happier and has lived more freely since arriving to New York, and that he has not seen her consume alcohol or rely on medication during this time.  CBL's love for his mother and concern with her well-being was apparent throughout the interview.

CBL named several of his friends in Manhattan and described partaking in the after-school activities typical for a person his age: soccer matches, acting in school plays, playing video games at his friends' homes, going out for pizza and his plan to visit an Escape Room.

CBL's words and demeanor conveyed enthusiasm about attending high school in the United States.  He said that he has submitted applications to private boarding schools and day schools in and near New York City, and that he has been attending open houses as part of the school-selection process.  CBL expressed particular enthusiasm for one boarding school based on what he described as its welcoming and accepting culture.  CBL is concerned that deadlines have now passed for application to competitive high schools in England, and believes that he is foreclosed from admission to such schools.  CBL presented as being highly motivated toward his academics, well-informed about his prospective schools, and thoughtful about his educational preferences.

CBL stated that he is strongly opposed to returning to London.  His views are informed by concerns over his mother's well-being and his worry that she would face "triggers" and anxieties caused by Individual-1 and English authorities.  CBL fears that her alcohol dependence could resurface if she returns to London.  CBL also is concerned about where the family would live, what school he would attend, and the privacy intrusions of the RBKC.

The RBKC has urged that the Court should not afford weight to CBL's views because they have been influenced by the undue suasion of Bafna-Louis.  See, e.g., Matovski v. Matovski, 2007 WL 2600862, at *10 (S.D.N.Y. Aug. 31, 2007) (noting that the age-and-maturity exception does not apply "where the opinion of the child is the product of undue influence by either parent.").  They assert that CBL's views reflect the "parentified" role that he has acquired as a result of prioritizing Bafna-Louis's needs over his own.  (Pet. Mem. 16-17.)

The Court does not doubt that CBL's views have indeed been affected by Bafna-Louis's opinions, as well as his sincere concern for her welfare.  But there was no indication in CBL's words and demeanor that his opinions are a product of parental coaching, coercion or undue suasion.  CBL's credibility and independence was underscored when, for example, he volunteered the possibility that Individual-2 had not intentionally followed him as he walked home from school, and that the incident had been unnerving even though it happened only once; he also stated that he has experienced no interference or harassment from Individual-1 or Individual-2 after he relocated to New York.  An unduly influenced child may have embellished such details.  CBL did not shy from acknowledging painful and hurtful experiences, but he described them with clarity.  He was thoughtful and composed throughout the conversation.  He also showed a concern for the accuracy of small details, such as when he proactively corrected the Court's understanding about the number of times he had flown as an unaccompanied minor. His responses on large and small topics reflected thoughtfulness, independence and precision, and did not suggest undue influence by Bafna-Louis or any other person.

CBL's preferences and opinions were not based exclusively on concerns about his mother, but also focused on his schooling and the life he is enjoying in the United States.  His engagement in the high-school selection process is unquestionably sincere and his demeanor

brightened when he described his potential options.  CBL presents as a highly intelligent and promising individual who is intent on pursuing his education, while also caring deeply about the circumstances of his mother and younger brother.

Accordingly, the Court finds and concludes that CBL is of an age and degree of maturity that it is appropriate to defer to his thoughtful views.  Pursuant to the discretion afforded under Article 13, the Court declines to order his return to the United Kingdom.

No Order of this Court will prevent CBL from either remaining in the United States or returning to the United Kingdom temporarily or permanently, as is his own choice. During the interview, the Court described different possible outcomes to the RBKC's petition, including the possibility that the petition could be granted as to Baby L but not as to CBL.  While he viewed such as result as very much not to his liking, he was resigned to the possibility, and stated his strong desire to remain with Bafna-Louis and Baby L.  Alternatively, it may come to pass that CBL elects to remain in the United States, perhaps as a student at one of the boarding schools he discussed.  Perhaps it would be possible for CBL to attend school in the United States while also making frequent visits to London.  CBL's post-hearing brief acknowledges a possible tension between his wish to remain with his immediate family and his desire to attend school in the United States, and asserts that the ability to choose for himself "is something he values highly."  (ECF 86.)  The Court concludes that CBL has the maturity to decide his preferred course of action, weighing the input of the adults in his life, rather than being ordered to return to the United Kingdom.

The Petition will therefore be denied as to CBL.

VI.   As to Baby L, Bafna-Louis Has Not Proven an Article
      13(b) Defense by Clear and Convincing Evidence.

      A.   The Requirement to Demonstrate a Grave Risk of Harm or an
           Intolerable Situation by Clear and Convincing Evidence.

           Article 13(b) of the Convention provides that a contracting state "is not bound to

order the return of the child" if the respondent proves that "there is a grave risk that his or her

return would expose the child to physical or psychological harm or otherwise place the child in

an intolerable situation."  An Article 13(b) defense must be proved by clear and convincing

evidence.  22 U.S.C. § 9003(e)(2)(A); Golan, 142 S. Ct. at 1889.

           "Under Article 13(b), a grave risk of harm from repatriation arises in two

situations: (1) where returning the child means sending him to a zone of war, famine, or disease;

or (2) in cases of serious abuse or neglect, or extraordinary emotional dependence, when the

court in the country of habitual residence, for whatever reason, may be incapable or unwilling to

give the child adequate protection."  Souratgar, 720 F.3d at 103 (quotation marks omitted;

emphasis in original).  Intolerable situations may include "[s]exual abuse of a child," "[o]ther

physical or psychological abuse, serious neglect, and domestic violence in the home . . . ."

Golan, 142 S. Ct. at 1894.  "The potential harm to the child must be severe, and the level of risk

and danger required to trigger this exception has consistently been held to be very high."

Souratgar, 720 F.3d at 103 (quotation marks and alteration omitted). The "grave risk exception is

to be interpreted narrowly, lest it swallow the rule."  Id.

           "Many cases for relief under the Convention arise from a backdrop of domestic

strife.  [Partner] abuse, however, is only relevant under Article 13(b) if it seriously endangers the

child.  The Article 13(b) inquiry is not whether repatriation would place the respondent parent's

safety at grave risk, but whether so doing would subject the child to a grave risk of physical or

psychological harm." <u>Id.</u> at 103-04.  "[L]imited incidents aimed at persons other than the child,

even if witnessed by the child, have not been found to constitute a grave risk."  <u>Id.</u> at 104.

Evidence of "inconvenience or hardship" does not demonstrate grave risk.  <u>Davies v. Davies</u>,

717 Fed. App'x 43, 48 (2d Cir. 2017) (summary order).

  B.  Bafna-Louis Has Not Demonstrated by Clear and Convincing Evidence
    <u>a Grave Risk of Physical or Psychological Harm to Baby L.</u>

    For the purpose of adjudicating the Rule 13(b) defense, the Court assumes

without deciding that the testimony of Bafna-Louis concerning the actions of Individual-1 and

Individual-2 was truthful.  Accepting the truth of her testimony, and drawing factual inferences

in her favor, Bafna-Louis has not met the very high burden required to demonstrate by clear and

convincing evidence that Baby L is at grave risk of physical or psychological harm if returned to

the United Kingdom.

    Bafna-Louis's testimony principally described harm that she personally suffered

as a result of the acts of Individual-1 and Individual-2, but not a grave risk of harm to Baby L.

The record does not support a finding that Baby L has suffered actual or threatened physical

harm at the hands of Individual-1 or Individual-2.  Bafna-Louis also has not demonstrated that

"the court in the country of habitual residence, <u>for</u> <u>whatever</u> <u>reason</u>, may be incapable or

unwilling to give the child adequate protection."  <u>Souratgar</u>, 720 F.3d at 103 (emphasis in

original).  To the contrary, the courts of England and Wales have been appropriately attentive to

the well-being of Baby L.

    1.  <u>The Actions of Individual-1.</u>

    As previously discussed, Bafna-Louis testified about the physical injuries inflicted

upon her at the hands of Individual-1, including a cut when he pressed a can against her

forehead, an incident where he shoved her head against a wall, the incident of rape, and his refusal to leave the home when he entered without permission.

Bafna-Louis described an incident where she believes that Individual-1 "abducted baby L from the home for 15 minutes," during which time she believes he took Baby L to a stairwell and obtained a sample of his DNA. (Tr. 206.) She was unaware of the purported abduction until she learned that a DNA test had been administered, at which point she spoke to Individual-1, who informed her how he obtained the DNA sample. (Tr. 206.) Bafna-Louis stated that Individual-3 reported the "abduction" to law enforcement and that she made no follow-up inquiry. (Tr. 206.)

Bafna-Louis testified that Individual-1 "followed" her five or six times and that he followed CBL five to ten times. (Tr. 207.) She did not elaborate on these incidents. She believes that Individual-1 intended "[t]o scare us." (Tr. 207.) Bafna-Louis testified that she discussed the incidents with Shanks of the RBKC and Bastock of the City of Westminster. (Tr. 207.) Bafna-Louis did not assert that she contacted London police about the incidents.

2. The Actions of Individual-2.

As discussed, Bafna-Louis testified that Individual-2 raped her after she consumed a small amount of wine and blacked out. After Bafna-Louis reported the rape to police and Individual-2 was arrested, he launched a harassment campaign that included conduct targeted toward CBL. Bafna-Louis described Individual-2's actions as follows:

> I mean, he just -- it was like a rottweiler. He just latched on to this family, my family, to me, to my son, my son's school, my son's headmaster, my friends, my godfather, wrote sexually explicit messages to my mother about what a slut that I was, that I was a liar, that he would destroy our lives, that his connections were worldwide, but in London that he was a king, that I should never expect my son to be able to go to a school. He spoke individually with other headmasters. He contacted his entire network. He

> followed us, he harassed us.  He took my mail from Eaton Place and
> would redeliver it in envelopes with his handwriting on it.  He did a
> lot of scary things, would follow us, mainly just wait in front of the
> house.  Probably the worst was the sheer number of calls and rings
> on the doorbell.  I mean, it would just be call, after call, after call,
> after call.  This went on for months.  It still goes on to a certain
> degree, but with the distance, he's lost steam a little bit, meaning the
> 4,000-mile distance.

(Tr. 180.)  Bafna-Louis stated that Individual-2 contacted CBL's school and the parents of his

friends in order "to thwart CBL's success" academically, athletically and socially.  (Tr. 183.)

When Individual-2 learned that Individual-3 would be visiting Bafna-Louis in New York, he told

Individual-3 that he should be in jail and threatened to sue Bafna-Louis for defamation.  (Tr.

183-86.)

Bafna-Louis's account is consistent with the voluminous text messages that

Individual-2 sent to Moody, which include scathing and profane characterizations of Bafna-

Louis.  (RX 32.)

3.   The Record Does Not Demonstrate Grave Risk of Physical
     <u>or Psychological Harm to Baby L.</u>

Accepting Bafna-Louis's version of events, the actions of Individual-1 and

Individual-2 were directed almost exclusively toward Bafna-Louis and not Baby L.  "The Article

13(b) inquiry is not whether repatriation would place the respondent parent's safety at grave risk,

but whether so doing would subject the child to a grave risk of physical or psychological harm."

<u>Souratgar</u>, 720 F.3d at 103-04.  There is no suggestion that either individual has behaved

violently toward Baby L or has threatened to do so.

Bafna-Louis used the word "abduction" to describe an incident in which

Individual-1 took a sample of Baby L's DNA without her knowledge and consent.  (Tr. 206.)

Her testimony about the incident lacked much detail, and was based on an incident that

Individual-1 apparently described to her.  The inflammatory word "abduction" is inconsistent

with the actions Bafna-Louis described.  Bafna-Louis did not identify other actual or threatened

harm to Baby L from Individual-1 or Individual-2.

   The burden to demonstrate "the level of risk and danger" required by Article

13(b) has been described as "very high."  Souratgar, 720 F.3d at 103.  It is usually accompanied

by evidence of "serious abuse or neglect" directed at the child, which is absent on this record.

Id.  On the totality of evidence, the Court finds that Bafna-Louis has not proven by clear and

convincing evidence that there is a grave risk that the return of Baby L would expose him to

grave physical or psychological harm.

    4. The Record Does Not Establish that the RBKC and the
     Courts of England and Wales Are Incapable or
     <u>Unwilling to Give Baby L Adequate Protection.</u>

   Even if Bafna-Louis had made a showing that Baby L is at risk of grave harm, she

has not made a showing that the RBKC and the courts of England and Wales may be incapable

or unwilling to provide him with adequate protection.  Souratgar, 720 F.3d at 103.

   As to Individual-1, Bafna-Louis testified that she did not seek police assistance

because she considers him to be a violent drug addict with gang affiliations, and therefore fears

retribution.  (Tr. 193-94.)  Concerning Individual-1's alleged rape, Bafna-Louis testified: "I had

reported to the police not specifics, like without a name."  (Tr. 199.)  She testified that

Individual-3 reported Individual-1's "abduction" of Baby L, but she made no follow-up inquiries

herself.  (Tr. 206.)  When she received medical attention following the incident where

Individual-1 pressed a torn can into her forehead, hospital staff encouraged her to contact law

enforcement, but she declined to, fearing reprisal from Individual-1.  (Tr. 193.)  She did,

however, describe Individual-1's actions to the City of Westminster and the RBKC.  (Tr. 206-

07.)  Bafna-Louis's testimony does not describe authorities' inability or unwillingness to protect her from Individual-1, and instead reflects that she did not seek their intervention.

The Court received into evidence a 59-page criminal history for Individual-1. (RX 35.)  It shows that Individual-1 has been arrested, charged and found guilty of numerous offenses, including possessing and distributing cocaine and cannabis, firearms crimes, burglary, battery, failure to surrender, and motor-vehicle infractions.  (Id.)  Many, though not all, of the offenses appear to have occurred when Individual-1 was a juvenile.  (Id.)  He entered pleas of guilty as to some offenses and was adjudicated not guilty as to others.  (Id.)  This record does not suggest an incapability or unwillingness by authorities in the United Kingdom to give adequate protection from Individual-1 and instead demonstrates that authorities arrested and prosecuted Individual-1.  The offenses appear to have occurred years before Individual-1 entered Bafna-Louis's life and do not suggest officials' inattention to Bafna-Louis's safety or an inability to protect Baby L.

The ongoing proceedings in the courts of England and Wales and the role of the RBKC also weigh against any conclusion that the courts would be unable or unwilling to provide the children with adequate protection.  Bafna-Louis points out that under a 2021 safety plan implemented by the City of Westminster, Individual-1 was permitted to be present in Bafna-Louis's family home, provided that he did not enter her bedroom, and urges that the English authorities cannot be trusted to safeguard the family.  (Resp. Post-Hearing Mem. at 16; Tr. 196-97.)  That arrangement was apparently short-lived, and Shanks testified that any future contact between Baby L and Individual-1 will be in a supervised setting to ensure the child's safety.  (Tr. 112.)  The RBKC now proposes 24/7 supervision of Bafna-Louis upon her return.  (PX 22.)  As discussed, the High Court has declared Baby L to be its Ward.  The High Court also has declared

that Individual-1 has parental responsibility for Baby L while noting the "central importance" of "safeguarding checks" and its attention to Individual-1's "character." (PX 13 at RBKC002664.)

After Bafna-Louis reported Individual-2's alleged rape to law enforcement, Individual-2 was arrested by London police and held for approximately 16 hours, though ultimately not charged. (Tr. 179.) Bafna-Louis exchanged emails with an officer who specialized in sexual abuse matters. (RX 30; Tr. 179.) In Bafna-Louis's view, the officer was "very upset that they couldn't prosecute this based on the fact that my memory wasn't there." (Tr. 179.) The emails suggest that the officer responded to Bafna-Louis's messages promptly and with sensitivity, and that she was appreciative of the officer's work. (RX 30.)

Bafna-Louis testified that police did not adequately respond to her reports about being followed by Individual-2, stating: "They really didn't do very much. They didn't rearrest him." (Tr. 189.) This is inconsistent with her testimony about the November 15, 2021 incident in which she dropped Baby L in the presence of law enforcement:

> [Individual-2] was outside my home and I became very afraid. I was on the sofa with baby L. I rang police. They came immediately, not just one or two officers, I think there were six to eight officers. I was carrying the baby from the living room to answer the front door. And I was shocked to see the number of police officers for that call.

(Tr. 232.) She also testified that prior to moving, "the metropolitan police installed panic buttons in my flat and where victim support said I was at risk of injury or homicide." (Tr. 152.)

The record taken as a whole demonstrates that when provided with adequate and timely information, the police, local authorities and the courts have shown a willingness to be attentive and responsive to Bafna-Louis's concerns. That the actions taken were not those she desired does not show that they are incapable of protecting Baby L.

The Court's finding that Bafna-Louis has not proven a grave risk of harm to Baby L if ordered returned to the United Kingdom is not undermined by the actions and claimed inactions of the police, the local authorities or the courts.  To the contrary, their attentiveness, and, in the case of the RBKC, their deep and demonstrated professional concern for the well-being of Baby L bolsters the Court's conclusion that any risk to Baby L will be mitigated to a level well below grave risk.

C.   Bafna-Louis Has Not Otherwise Demonstrated by Clear and Convincing Evidence that Baby L's Return Would Give Rise to an Intolerable Situation.

Bafna-Louis has urged that uncertainties around the family's immigration status in the United Kingdom creates an intolerable situation that could result in border authorities denying her entry and leaving Baby L in the exclusive care of social services workers.  (Resp. Post-Hearing Mem. at 18-22.)

Bafna-Louis asserts that she fears criminal prosecution or civil penalties if she and the children attempt to re-enter the United Kingdom.  (Id. at 20.)  Prior to the implementation of Brexit policies, Bafna-Louis freely entered and exited the United Kingdom using a Hungarian passport.  (Tr. 155, 157-58.)  She testified that under the post-Brexit system, she must apply to the United Kingdom for settlement as a resident.  (Tr. 155.)  Bafna-Louis testified that she and CBL had previously been deported for a visa violation, and in January 2022, border authorities permitted her entry to England only because she produced an outbound ticket.  (Tr. 157, 164-65.)

Bafna-Louis stated that she previously believed that Baby L had British citizenship because Individual-3 was his biological father.  (Tr. 165-66.)  She states that Individual-1 is a citizen of Nigeria and not the United Kingdom, and that after the High Court found Individual-1 to be Baby L's biological father, she surrendered Baby L's United Kingdom

passport to the British consulate in New York City, out of concern that it would be unlawful to continue the use of that passport.  (Tr. 140-45.)

As an initial matter, Bafna-Louis has not demonstrated that her potential separation from Baby L due to their immigration status would itself rise to the severity of an "intolerable situation" under the Hague Convention.  See, e.g., In re Koc, 181 F. Supp. 2d 136, 156 (E.D.N.Y. 2001) ("to the extent that respondent asserts that an order of this Court returning Paulina to Poland would cause Paulina 'grave harm' because she would be denied 'the benefit of motherly love' (Broydes Aff. at 9), respondent ignores the fact that this is a consequence of choices made by respondent and not one that this Court may consider in determining the questions presented here."), R&R adopted (Apr. 3, 2001).

There is no evidence, however, that the RBKC or the High Court wishes to separate Bafna-Louis from the children.  Hearing exhibits and Bafna-Louis's testimony demonstrate that the High Court has attempted to facilitate visas and that Bafna-Louis has engaged in dilatory conduct to frustrate entry to the United Kingdom.

The High Court has issued orders and requests to facilitate visas for Bafna-Louis, CBL and Baby L.  (PX 13 at RBKC002562 (order of 11/15/22 requesting the Secretary of State for the Home Department to grant visas "in order for the children and their mother to enter the UK and remain her [sic] for the period of the ongoing proceedings.").  In an Order of December 13, 2022, the High Court concluded that Baby L does not require a visa because he has a valid British passport through January 2027, directed the RBKC to apply for a visa on behalf of CBL if required, and ordered Bafna-Louis to make further application for a visa to re-enter the United Kingdom.  (Id. at RBKC002668.)

Bafna-Louis's testimony about her efforts to submit passport-renewal and visa applications reflected an intent to hinder or delay smooth entry to the United Kingdom.  Bafna-Louis is intelligent, well-educated and able to properly complete a visa application if she genuinely desires the application to be granted.  In a visa application of August 22, 2022, which was denied, Bafna-Louis did not state that she was submitting the application in connection with the High Court's orders, and simply attached the orders without explanation.  (Tr. at 338-39; RX 8.)  The application was for a six-month visa, but it expressed an intention to be in the United Kingdom for one year.  (Tr. 333-34; RX 8 at 1-2.)  The application stated that Bafna-Louis did not have a valid passport or national identity card.  (RX 8 at 2.)  She testified about an expired U.S. passport and a damaged Hungarian passport, and stated that she had not attempted to renew the U.S. passport.  (Tr. 335-36 ("I had a valid U.S. passport, and between the rape, the harassment, the pregnancy, the move, I had other things to do than to get this passport renewed.").)  The visa application listed an erroneous passport number and incorrect issue and expiration dates.  (Tr. 339-40.)

The application asserted that Bafna-Louis planned to spend £500 while in the United Kingdom but that she spent £8,000 a month on living expenses.  (RX 8 at 5; Tr. 343-44.) The Court finds that Bafna-Louis knew and intended that this anomaly would result in her application being delayed or denied.

The application asserted that Bafna-Louis did not go by any other name, even though she had legally changed her name in the United Kingdom.  (RX 8 at 2; Tr. 346-47.)  She endeavored to explain this away, stating, "I have no identification, passport, license or other to show [the changed name] as a formal name on anything apart from baby L's birth certificate."

(Tr. 347.)  The Court finds that the failure to disclose the name change was a deliberate deception designed to stall the visa process.

No party has submitted the Home Office's written denial of the August 22 visa application, though it is partially quoted in the Haywood Declaration.  (Haywood Dec. ¶ 92.) Haywood is a barrister who has practiced United Kingdom immigration law since 2001.  (Id. ¶ 1.)  He opines that if the application had cited to the Family Court proceedings, demonstrated Bafna-Louis's financial circumstances, and requested to visit within the six-month limit, "it would likely be a viable application."  (Id. ¶¶ 93-94.)

Bafna-Louis submitted a second visa application on December 24, 2022.  (RX 9.) She testified that the application was completed by "Tanya," who Bafna-Louis described as "[a] lady who assists sometimes with administrative work . . . ."  (Tr. 347-48.)  The application inquired about the purpose of the visit, and her response stated in capitalized letters, "I AM VISITING FOR ANOTHER REASON."  (RX 9.)  It did not mention proceedings before the High Court.  (Id.)  The application was for a six-month visa but stated that the stay would last from January 13, 2023 to January 13, 2025.  (Id.)  Bafna-Louis first testified that this application "was never submitted," but then testified, "I don't know if this is the final one or – I would need to check with Tanya."  (Tr. 351-52.)  The application appears to have included other errors or omissions, including the omission of her changed legal name in the United Kingdom, the omission of alternate email addresses, and incorrect passport information.  (Tr. 352-57, 380.)

With even modest diligence and attention to detail, Bafna-Louis could easily complete an accurate application for an immigration visa.  The High Court and the RBKC have attempted to facilitate smooth entry into the United Kingdom for Bafna-Louis, CBL and Baby L.

The Haywood Declaration opines that Bafna-Louis and Baby L are likely eligible for entry to the United Kingdom on more than one basis.  He opines that Baby L is likely a United Kingdom citizen through the immigration status of his biological father, Individual-1. (Haywood Dec. ¶¶ 26-33, 50.)  Haywood opines that based on the duration of Bafna-Louis's pre-Brexit residency in London, and Hungary's status as a member of the European Union, she may be eligible to reside in the UK under the country's "EU Settlement Scheme."  (Id. ¶¶ 37-46.) Alternatively, he opines that an accurate and complete application for a six-month visitor visa would likely be granted to Bafna-Louis, and that future extension requests "have good prima facie prospects of being granted" because "her presence was necessary because the proceedings were ongoing and her participation was necessary, or she would otherwise be prejudiced by not being present; or because of reasons related to the welfare of the children . . . ."  (Id. ¶ 83.) Haywood points to authority that permits parents to remain in the United Kingdom in order to participate in family proceedings.  (Id. ¶ 84 & Ex. E.)  He further states that while Family Court orders are not binding on the Home Office's immigration functions, they "carry very significant weight" and the Home Office is required to consider them under the Borders, Citizenship and Immigration Act of 2009 and the UN Convention on the Rights of the Child.  (Id. ¶¶ 87-90.)  To the extent that Bafna-Louis has cited fear of criminal prosecution for violating immigration laws of the United Kingdom, Haywood considers such a fear unfounded, because she would either be entering the country pursuant to a visa or lawfully through an airport as a "non-visa national." (Id. ¶¶ 54-55, 67-69.)

The Court does not afford significant weigh to the immigration-law opinions of Individual-3, who states that his knowledge of relevant facts does not go beyond August 2022,[14] does not annex authority or evidence and often engages in speculation.[15]  (ECF 58.)

Bafna-Louis has not demonstrated a likelihood that, upon submission and processing of adequate immigration papers, she or Baby L would be denied entry to the United Kingdom.  She has not demonstrated by clear and convincing evidence that any uncertainty on immigration matters creates an intolerable situation.

CONCLUSION.

The Petition is GRANTED as to Baby L, who is identified in the Petition as LCJB.  Based on the age and degree of maturity of CBL, the Court exercises the discretion afforded to it under Article 13 of the Hague Convention, defers to CBL's objections, and declines to order his return.  The Petition is therefore DENIED as to CBL.

The Clerk is respectfully directed to terminate the letter-motion at ECF 78.

Within seven days of this Opinion and Order, the RBKC shall file a proposed Order for the return of Baby L to the United Kingdom.  Bafna-Louis may file a response within five days of the filing of the RBKC's proposed Order.  Because of the time sensitivity of this matter, the Court does not anticipate extending these time periods.

---

[14] Individual-3 Dec. ¶ 2 ("I do not have access to the papers in this matter either in the USA or in England and thus, in so far as my submissions are based on facts, they date from a time I was involved in the English proceedings which ended in August 2022.").

[15] See, e.g., Individual-3 Dec. ¶ 8 ("With regards to the possibility that [Individual-1] obtained his ILR by deception this cannot be ruled out in view of the fact that he is not a gentleman of good character and no evidence of this being considered has, as I understand it, yet been produced by the Petitioner.").

SO ORDERED.

P. Kevin Castel
United States District Judge

Dated: New York, New York
      March 7, 2023